683 So.2d 859 (1996)
Raymond and Margaret DELAUNE
v.
MEDICAL CENTER OF BATON ROUGE, INC.
No. 95 CA 1190.
Court of Appeal of Louisiana, First Circuit.
October 25, 1996.
Rehearing Denied December 23, 1996.
*861 W. Arthur Abercrombie, David H. Hanchey, Baton Rouge, for Plaintiff-Appellant Raymond and Margaret Delaune.
John Swanner, Daniel Reed, Baton Rouge, for Defendants-Appellees Medical Center of Baton Rouge, Inc., St. Paul Fire and Marine Insurance Company.
Before LOTTINGER, C.J., and SHORTESS, GONZALES, PITCHER, and FITZSIMMONS, JJ.
*862 FITZSIMMONS, Judge.
Plaintiffs, Margaret and Raymond Delaune, filed suit against Medical Center of Baton Rouge, Inc.[1] It was alleged that Mrs. Delaune's slip and fall in the hospital bathroom during her admission, and the resulting physical injuries, were caused by a defective design or defective condition of the hospital facility. This defective condition or design created soapy water on the bathroom floor. The plaintiffs also alleged negligence on the part of the hospital in its failure to provide safety devices to counteract the substandard design and/or the lack of any warning devices that might have alerted petitioner to the deviate condition. The jury found that the condition of the bathroom did not pose an unreasonable risk of harm to the petitioner, and rendered a verdict in favor of the hospital. Thereafter, the trial court denied petitioners' Motion for Judgment Notwithstanding the Verdict (JNOV), and dismissed the claim. Plaintiffs/appellants have appealed the denial of the JNOV, as well as the jury verdict.
This court finds that the jury committed manifest error regarding the condition of the bathroom. A verdict should have been granted by the trial court in favor of the plaintiffs. The overwhelming evidence demonstrates that the design of the shower exit clearly presented an unreasonable risk to the petitioner and/or that the hospital was grossly negligent for assigning Mrs. Delaune to a defective room with a defective bath, a bathroom not designed for an ambulatory patient.

BACKGROUND
Plaintiff, Margaret Delaune, had been admitted to the Medical Center of Baton Rouge for oral esophageal mucositis. This debilitating side effect is the direct result of ongoing combined chemo-radiotherapy for small cell cancer. At the time of her hospital admission, Mrs. Delaune required the support of a walker or special cane to travel. She was a very ill woman who placed herself in the custody and care of the hospital. The hospital personnel arbitrarily assigned Mrs. Delaune to a room which contained a bathroom shower that had been retrofitted subsequent to its original construction. The changes to the shower area had been performed to satisfy federal requirements. A certain portion of the rooms had to contain handicapped bathrooms suitable for wheelchair accessibility. Due to the lack of available space within the existing square footage of the bathroom, the shower lip was lowered and covered with a twelve inch wide [or long] sloping aluminum piece. This piece was appended to the shower stall to permit wheel chairs to roll in and out of the shower stall.
Mrs. Delaune slipped and fell in her assigned hospital bathroom while exiting from the shower. She sustained a fracture of the proximal humerus of her left arm. The treatment required surgical implantation of a prosthetic shoulder replacement. She suffered a residual loss of use, and a chronic condition of daily pain. Given her total physical deterioration, as well as side effects from the chemotherapy and radiation therapy, Mrs. Delaune had a total loss of recall about her fall or even exiting from the shower.
The jury reached its decision in favor of the defendants after the consideration of one jury instruction. That question on the Jury Verdict Form read as follows: "At the time of the accident, did the bathroom at Medical Center of Baton Rouge, create an unreasonable risk of harm to Margaret Delaune?" The jury answer was "no". They were, thereupon, instructed to stop. The jury did not reach causation or damages, which issues were pretermitted by its initial legal conclusion.

STRICT LIABILITY AND NEGLIGENCE
In an assertion of strict liability, the petitioner bears a three-tiered burden of proof in order to fall within the ambit of La.Civ.Code arts. 2317 and 2322. This judicially created test incorporates the following prerequisite determinations: 1) the thing which caused damages was in the care, custody and control of the defendant; 2) the thing had a vice or defect which created an unreasonable *863 risk of harm; and 3) the injuries were caused by the defect. Sistler v. Liberty Mutual Insurance Company, 558 So.2d 1106, 1112 (La.1990). Plaintiff's coextensive claim in negligence, under the aegis of La.Civ.Code art. 2315, assumes the same burden of proof, with the additional element of defendant's scienter, or knowledge, of the defect. Sistler v. Liberty Mutual Insurance Company, 558 So.2d at p. 1112, n. 7.
It was stipulated by the parties that the bathroom and shower were in the care, custody and control of the defendant. Mrs. Delaune was a registered patient at Medical Center of Baton Rouge, Inc. hospital. The first tier of the test is satisfied. We now address the second variableunreasonable risk of harm.
The judicially created operative variable in determining whether the hospital breached a duty owed to Mrs. Delaune in the instant matter, is determined pursuant to an analysis of the principal of "standard of care". It is only after a finding of the applicable standard of care, or duty, and its breach, that the legal conclusion of unreasonable risk of harm can be derived. We expressly do not expand the standard of care imposed upon a hospital. However, we do examine the relationship of this legal precept as it should be applied to varied locations, individuals, and environments.
The judicial system has historically recognized the myriad factors inherent in defining a particular defendant's duty, or standard of care. The precise duty of the party who has control, or garde, of specific property is contingent upon the nature of the facility and the individualized dangers presented by it. In Walker v. Union Oil Mill, Inc., 369 So.2d 1043, 1047 (La.1979), the supreme court observed the following:
In determining a particular defendant's duty consideration should be given to the nature of the facility and the dangers presented by it. In considering a defendant's duty to a particular person, consideration should be given to the person's age, maturity, experience, familiarity with the premises and its dangers, and other such factors which might increase or decrease the risk of harm to that person. It would be lesser to a person with experience, knowledge and familiarity with the premises. Walker, 369 So.2d. at p. 1047.
Thereafter, in Levi v. Southwest Louisiana Electric Membership Cooperative, 542 So.2d 1081, 1084 (La.1989), the supreme court again contemplated the numerous considerations to be reviewed as follows:
The legal duty under one approach [duty/risk] and the standard of conduct under the other [negligence] impose the same obligation, ... If the risk [,]which took effect as plaintiff's injuries[,] was an unreasonable one, and the power company failed to comply with a duty or standard of care requiring it to take precautions against that danger, the risk was within the scope of the defendant's duty and defendant's substandard conduct was a legal cause of the injuries.... A [defendant] is required to recognize that its conduct involves a risk of causing harm to another if a reasonable person would do so while exercising such attention, perception of the circumstances, memory, knowledge of other pertinent matters, intelligence and judgment as a reasonable person would have. id.

Again in Socorro v. City of New Orleans, 579 So.2d 931 (La.1991), the supreme court shifted the focus from general responsibilities to the particular circumstances of the case to determine the extent of the duty from which the required standard of care is derived. Chief Justice Calogero enunciated the following: "... we first note that under traditional duty/risk analysis, we are to view the defendant and the accident victim as individual and unique social actors, rather than representatives of groups of social actors." Socorro v. City of New Orleans, 579 So.2d at 938.
The test to determine whether an owner or custodian (in this case a hospital) has fulfilled the minimum requirements to satisfy its duty, or standard of care, for the safety of persons on its premises, and the legal obligation of not exposing such persons to unreasonable risks of injury or harm, is employed by considering the above referenced uniform guidelines and variables. However, the particular circumstances that *864 might be determined to constitute substandard conditions will obviously vary, depending on the totality of circumstances when balancing the individual variables. The exact requirements to conform to the archetypal standard of care of the owner of a private home are necessarily distinguishable from the individual requirements of an owner of a public store, an abandoned building, remote undeveloped land, a junk yard, or a hospital. The character of situs, which we call environment, must be the initial factual determinant in the duty/risk analysis. This "jumping off" point is the same under either a negligence or strict liability exposure. Additionally, this particular duty owed to persons who enter premises will inherently differ depending on the particular characteristics of the unique person in question. Age, experience, familiarity, physical condition, purpose, and other similar characteristics are factored into this equation. There will, therefore, naturally be different conclusions of what constitutes breach of standard of care, depending upon the particular individual, the particular circumstances, and the particular environment.
In Landry v. State, 495 So.2d 1284 (La. 1986), the court utilized the uniform criteria for standard of care and unreasonable risk of harm pronounced in Entrevia v. Hood, 427 So.2d 1146 (La.1983); however, the court reached a very contrasting result due to the difference in individual circumstances. In Landry, the factual scenario differed from the particular environment in Entrevia. The defect in Landry was in a location that was used frequently, as opposed to a remote location in Entrevia. The conduct in which the plaintiff engaged was legal and to be anticipated in Landry, rather than the trespassing in Entrevia that factually distinguished it. The cost of any burden imposed on the owner in Landry could be spread among the users of the area and the cost of prevention would not be substantial, as opposed to a heavy burden on an individual in Entrevia. The potential for harm in Landry was great because the property was heavily used at all hours by adults and children, in contrast to an abandoned site in Entrevia. The court, therefore, concluded that the standard of care had been breached in Landry; whereas, the balance of the same variables had resulted in an opposite finding in Entrevia. In both instances, the court proceeded with "... a study of the law and customs, a balancing of claims and interests, a weighing of the risk and the gravity of harm, and a consideration of individual and societal rights and obligations." Langlois v. Allied Chemical Corporation, 258 La. 1067, 1084, 249 So.2d 133, 140 (1971).
The supreme court has addressed the particular standard of care required for a hospital. "A hospital is bound to exercise the requisite amount of care toward a patient that the particular patient's condition may require." Hunt v. Bogalusa Community Medical Center, 303 So.2d 745, 747 (La.1974). Furthermore, the hospital bears the responsibility of protecting a patient from perils that may "result from the patient's physical and mental incapacities as well as from external circumstances peculiarly within the hospital's control." id.
The duty analysis set forth by the supreme court in Walker v. Union Oil Mill, Inc., 369 So.2d at P. 1047, was followed in Head v. St. Paul Fire & Marine Insurance Company, 408 So.2d 1174 (La.App. 3rd Cir.), writ denied, 412 So.2d 99 (La.1982). The issue involved a roll-over curb at the entranceway of a hospital. Head makes the following pronouncement:
The facility that we are concerned with is a hospital which, by its very nature, will be used frequently by the infirm, the feeble, and the elderly. Because of their age and/or infirmities, it is particularly difficult for these persons to safely move about. We believe that a hospital owes a duty to such persons to warn them of the existence of any obstacles or dangers, which may present a hazard to them, as they move about the hospital, or in and out of it. Defendant-hospital owed this duty to plaintiff." (Italics supplied) Head v. St. Paul Fire & Marine, 408 So.2d at P. 1178.

PLACEMENT
At the time of admission, according to her primary physician, Mrs. Delaune was dehydrated and in a "significantly debilitated state and morbid condition." Although the *865 petitioner did not need a wheelchair, she entered the hospital with a walker or cane. Thus, Medical Center of Baton Rouge, Inc. knew she walked, but she ambulated with an aid. Firm, level footing provided her the best and safest traversal. We noted in Creel v. Washington Parish Fair Association, 597 So.2d 487 (La.App. 1st Cir.1992), writ denied, 599 So.2d 305 (La.1992), that, "The owner, or a person having custody, of immovable property owes his invitee the duty to keep the property in a reasonable safe condition for use which is consistent with the purpose of the invitation, including the discovery of reasonably foreseeable conditions which may be dangerous ..." 597 So.2d at p. 491.
Mrs. Delaune had specifically entrusted herself to the care and control of the hospital because she was physically debilitated, and precisely because a hospital holds itself out as possessing particularized knowledge or expertise. A hospital exists for the very purpose of providing medical or surgical care and treatment for the sick and injured. It specializes in receiving and treating invitees whose physical status requires special conditions. Thus, Medical Center of Baton Rouge, Inc., a fortiori, assumed a duty to provide accommodations for this petitioner/appellant commensurate with her particular physical condition and to protect her from her particular infirmities.
The hospital administration, by its choice, specifically assigned Mrs. Delaune to one of the few rooms that did not have a firm, level footing surface. Quite to the contrary, the hospital housed this ambulatory woman in a room modified with ramps specifically constructed for wheel chair patients.[2] This room, with these ramps placed in two rooms on a 78 room floor, represented the hospital's negligent choice of placement. Mrs. Delaune had no say in her accommodations. The hospital failed to distinguish between wheel chair patients and ambulatory, but aid-assisted, patients. See, La.Civ.Code art. 2315. This choice of placement by the hospital, with full knowledge of her condition, exposed Mrs. Delaune to an unreasonable risk of harm.

THE DEFECTIVE ENVIRONMENT

THE RAMP
The trial court opined that the American National Safety Institute (ANSI)[3] minimum safety standards were not controlling in the matter. This conclusion completely sidesteps the irrefutable evidence demonstrating that the shower facility was patently defective.
Undisputed expert testimony was introduced by two defense witnesses. One was a safety consultant. The other was an architect, who had designed and been involved in the construction of hospitals for twenty-four years. They irrefutably demonstrated that the metal ramp violated the ANSI standards that were in effect for new bathrooms at the time of the renovation of the hospital's shower.[4] More importantly, it was unequivocally shown that the ratio of the rise in horizontal dimension of the retrofitted metal shower did not even conform to the ANSI provisions. These provisions required existing hospitals to possess a certain percentage of handicapped ramped baths. These retrofitted ramps were allowed a more lenient maximum ratio of not more than a horizontal distance to a rise of eight to one. The hospital ramp in question falls far short of even this relaxed gradient standard. The rise of the metal slope in question was designed by the hospital architect to have a ratio of only approximately six to one. This is a deviation of almost twenty five percent (25%), or a 9 degree angle, translated to a rise in the ramp *866 of one and seven-eighths inches in eleven horizontal inches. The actual "as-built" ramp, however, was even steeper in measurement: the run to rise ratio was 1 to 3.76, or 14.9 degrees of slope. This constitutes over twice the more lenient maximum ratio permitted for reconstructed buildings.
The architect for the hospital, Jerry Watts, who had designed the retrofitted ramp, had been affiliated with hospital design for over thirty years. He admitted that the design was not in conformity with the ANSI safety standards for pre-existing structures. He indicated that alternate designs that were in conformity with the safety standards would have been structurally problematic or "cost prohibitive". It would have necessitated enlarging the bathroom to accommodate the expanded shower exit area. It is noteworthy that he had never utilized a metal ramp similar to the ramp sub judice in any other hospital. Both experts who testified on behalf of the Delaunes also stated that they had never seen a bathroom with a metal plate such as the ramp at issue.
Pertinent to the issue before us is the testimony by the Delaune's architect, Clifton Lasseigne, that the actual construction possessed a slope that was even steeper than the substandard architectural rendering. As mentioned hereinabove, not only was the design not in conformity, but the reality of the ramp's actual dimensions had an even more deviant ratio of approximately three and three fourths to one. This ratio is more than twice the relaxed standard for a slope that was permitted for pre-existing bathroom/shower accommodations. The architect for the hospital inferred refutation of the measurements taken by appellants' expert witness on the basis that the fire marshal would not have permitted a width to height ratio of even four to one. However, the hospital's architect had not measured the slope or width of the built ramp. Furthermore, no evidence was presented that confirmed final approval by the fire marshal of the actual ramp that caused Mrs. Delaune to fall. The jury's determination of the existence vel non of a defect was precluded by its initial, and only, finding that the bathroom did not create an unreasonable risk of harm to the plaintiff.

THE FLOOR
It was recognized by both parties that water was on the floor of the bathroom after Mrs. Delaune's fall. A pivotal determination in this matter is whether the defective slope of the metal ramp caused water in the shower to flow onto the bathroom floor or whether the observed dampness was a consequence of Mrs. Delaune's fall. Her safety expert, Michael Frenzel, testified that the design of the modification to the shower lip created a slope that would produce leakage of water over the ramp. The water settled on the floor of the bathroom while the shower was being used. Mr. Frenzel additionally opined that the shower curtain was not long enough to contain the flow of water. This expert assessment was based upon his personal observation of the particular curtain in question. That opinion was reinforced by plaintiff's architect, Mr. Lasseigne. He testified that the shower curtain did not appear to be long enough to keep water from running out underneath it and on to the floor. Mr. Lasseigne further noted that even if weights had been put on the bottom of the curtain to hold it in place, it would be very difficult to maintain the proper position to prevent water flow to the bathroom floor.
Appellee's architect, Mr. Watts, stated that he had recommended a full-length shower curtain, which would be capable of being positioned inside the shower so that water would not run out on the floor. He stated that he had seen the curtain in question and that it appeared to be full length and capable of holding water inside. However, he did not address the practical reality of maintaining that particular curtain position during the normal course of taking a shower by an infirm patient. Finally, photographs that were introduced into evidence clearly reveal that the curtain does not extend to the floor level. This fact renders moot the possibility that the water would have possibly been contained by a full-length curtain inside the shower stall during its use.
This compelling evidence notwithstanding, powerful testimony was provided by petitioner's *867 daughter. She was the first person to find petitioner on the bathroom floor immediately after her mother's fall. Mrs. Lindsey stated that she remembered seeing soapy water on the metal ramp and on the floor of the bathroom. If Mrs. Delaune had produced the water as a result of the fall, it would not have logically been soapy at the time that she exited the shower. There is no evidence to suggest that she departed the shower with soap on her body. These facts and inferences point so overwhelmingly in favor of a determination that the damp condition on the floor emanated directly from the defective slope of the ramp, we find that the jury was manifestly erroneous.

UNREASONABLE RISK OF HARM
Most recently, this court has delineated the proper standard of review by the appellate court in addressing an unreasonable risk of harm issue. In Phipps v. Amtrak 94-1876, p. 5-8 (La.App. I Cir. 11/20/95); 666 So.2d 341, 343-345, we specifically reviewed the trial court's factual findings, regarding physical configuration, pursuant to the manifest error standard. It was observed that application of the unreasonable risk of harm test encompasses a combination of fact and law. After according the trial court the benefit of the manifest error rule vis-a-vis factual findings, a reviewing court is not guided by the manifest error rule in its examination of legal determinations. Since a decision of "unreasonable risk of harm" necessarily inheres a question of law, the reviewing court owes no deference to the legal conclusions of the trial court. Appellate review of questions of law consists of a determination of whether the trial court was legally correct or incorrect. In order to arrive at that juncture the entirety of the matter must be analyzed. See, Phipps, 94-1816, at P. 5-6; 666 So.2d at P. 343-344.
"Unreasonable risk of harm" has been explained in numerous interpretative discussions by the judiciary. In Entrevia v. Hood, 427 So.2d 1146, 1149 (La.1983), the supreme court cautioned that the unreasonable risk of harm criterion is not a simple rule of law which can be mechanically employed to each factual scenario. As stated above, the case law in both negligence and strict liability causes is replete with analyses of the multifaceted variables to be scrutinized when weighing the risk of the thing against its utility. See, Meany v. Meany, 94-0251 (La. 7/15/94); 639 So.2d 229; Socorro v. City of New Orleans, 579 So.2d 931 (La.1991); Sistler v. Liberty Mutual Insurance Company, 558 So.2d 1106 (La.1990); Bernard v. The Great Atlantic and Pacific Tea Company, 93-1711 at p. 3 (La.App. 1st Cir. 8/25/94); 645 So.2d 1157, 1158; Dobson v. Louisiana Power and Light Company, 550 So.2d 1334 (La.App. 1st Cir.1989), aff'd in part, amended in part, 567 So.2d 569. Other than in the most obvious of cases, the interpreter must consider the particular situation and that situation's relationship to the general precepts of law provided in La.Civ.Code Art. 2317 and 2322. It is only after such a viewing of the particular facts, can this court decide which risks are contained in the codal mandates, while balancing the moral, social and economic utility necessary for a prudent decision. Entrevia, 427 So.2d at p. 1149. Therefore, we ask the question: did the defect cause an unreasonable risk of harm to Mrs. Delaune?
In the matter before us the plaintiff pointed to the lack of warning signs that would have notified the petitioner and other invitees that the rise in the ramp was non-conforming and substandard. Additionally, although the architect who designed the ramp in question testified that the metal utilized for the ramp was "standard material", all three expert consultants, including the hospital's own architect, stated that they had never seen that type of ramp in a bathroom. Mr. Lindsey, plaintiff's architectural expert, opined that the metal in question was standard for industrially related usage by people wearing appropriate shoes, but it was not suitable for traversing the floor barefooted. The evidence is a continuum of danger: lack of easily accessible handrails that could be supportive while in the process of crossing over the twelve inch curved ramp, failure to provide a slip-resistant floor surface, lack of a bottom weighted curtain, and the lack of a lip rise to retain water, all substantiate the proposition that the hospital breached a legal duty to protect against, or at the very best to *868 minimize, the possibility of the particular risk of falling while exiting the shower.
The potential for harm in a hospital is vast. It is particularly poignant in this case because the shower facility is likely to be used by a large number of infirm patients, such that foot traffic will be frequent. See, Head v. St. Paul Fire & Marine, 408 So.2d at p. 1178. The cost of any financial burden imposed on the hospital to provide bathroom/shower facilities that would not pose a safety threat to its users is far outweighed by the undue risk of harm to the patients. Landry v. State, 495 So.2d at p. 1288.
The hospital chose to cut costs by not properly expanding the bathroom area so that it could adequately accommodate both wheelchair and non-wheelchair users. The bathrooms that were retrofitted with substandard ramps for wheelchairs became ill-suited for non-wheelchair patients submitted to the hospital's care and control. The fact that Mrs. Delaune was not operating a wheelchair does not exclude the facility from its responsibility to provide safe, accessible pathways in her weakened and handicapped condition. A strong, healthy, mentally alert, non-medicated individual might have had minimal trouble overcoming the defects in the bathroom, such that the ramp might not have presented an unreasonable risk. Given her significantly weakened physical and mental condition, Mrs. Delaune exemplifies the profile of the patient for whom the retrofitted ramp posed a serious risk of harm.
Even having weighed the factual questions and inferences in a light most favorable to the defendant, the evidence is overwhelming in favor of the existence of a defect that constituted an unreasonable risk of harm to this hospital patient, which was the cause in fact of injuries that befell Mrs. Delaune. The initial, unilateral choice of a particular room for Mrs. Delaune, by the hospital, fully cognizant of her physical and mental status, constituted a breach of its duty to this particular patient. Moreover, the accident was a natural consequence of the inadequate condition of the shower threshold. See, Wheat v. State Farm Fire and Casualty Company, 583 So.2d 1, 3 (La.App. 1st Cir.), writ denied, 583 So.2d 1145 (La.1991). This court cannot sustain the trial court reasoning and determination absolving the hospital facility from its delictual duty owed to this petitioner.

COMPARATIVE NEGLIGENCE
It is now judicially accepted that contributory negligence, which triggers the comparative negligence provisions of La.Civ. Code art. 2323, is a defense in a strict liability case, as well as a proceeding based on negligence. Wheat v. State Farm Fire and Casualty Company, 583 So.2d at p. 3. Defendant bears the burden of proving by a preponderance of evidence, how the petitioner's behavior fell below the conduct of reasonably prudent persons in comparable circumstances and conditions. See, Morgan v. Hartford Accident and Indemnity Company, 402 So.2d 640, 643 (La.1981).
Mrs. Delaune was not restricted from taking a shower. Her physician had left orders that she was to get out of bed with assistance three times a day. Her daughter had escorted her to the shower area. It was reasonable for the petitioner to assume that she could take a shower, and no contrary instructions had been given. The risk of having to negotiate a defectively constructed shower threshold, and having no alternative but to land on a wet floor immediately thereafter, critically exceeds the parameters of an obvious or easily avoidable danger. See, Shelton v. Aetna Casualty & Surety Co., 334 So.2d 406 (La.1976).
There is no evidence before this court that demonstrates that plaintiff's conduct fell below the standard to which a person should conform for her own safety and protection under the circumstances. See Day v. South Line Equipment Co., 551 So.2d 774 (La.App. 1st Cir.), writ denied, 553 So.2d 474 (La.1989); Head v. St. Paul Fire & Marine Insurance Company, 408 So.2d at p. 1180. Any weakened medical condition, which might have predisposed her to falling, is not an element that can be used to prove contributory negligence or fault. Wheat v. State Farm Fire and Casualty Co., 583 So.2d at p. 4. This premise applies, a fortiori, in a hospital setting where the infirm, the weak, the debilitated constitute the shower users.
*869 We find that defendant failed to exculpate itself or reduce its proportionate fault by proving that plaintiff was guilty of contributory negligence or comparative fault. The jury's verdict is reversed. The defendant/appellee is strictly liable under La.Civ.Code art. 2317, or negligent under La.Civ.Code art. 2315, and thus liable for plaintiff's injuries caused by the defective condition of the bathroom and shower.

QUANTUM
The petitioner died on June 9, 1995, shortly following the trial court decision of March 30, 1995. With regard to future medical expenses, that matter is remanded to the trial court for a determination of the medical expenses incurred by Mrs. Delaune from the date of the trial until her death.
After a thorough review of the medical evidence available to this court in the record, damages to the petitioners are awarded in the following sums:

1) The heirs of Margaret Delaune: Shireen Delaune
 Blanchard, Della Delaune Lindsey, Theresa Delaune
 Barrow, and Michael W. Delaune
 General damages ........................ $400,000
 Past medical expenses .................. $101,354
 Medical expenses between trial
 and death .............................. to be determined
 on remand.
2) Raymond Delaune
 Loss of consortium ..................... $50,000

All costs of this appeal and in the trial court are assessed against defendant/appellee.
REVERSED, RENDERED, AND REMANDED.
LOTTINGER, C.J., concurs.
GONZALES, J., respectfully dissents and will assign reasons.
NOTES
[1] Margaret Delaune died on June 9, 1995. The heirs, Shireen Delaune Blanchard, Della Delaune Lindsey, Theresa Delaune Barrow, and Michael W. Delaune were substituted as parties plaintiff.
[2] There were seventy-eight rooms located on the hospital floor to which chemotherapy patients were assigned. Two rooms, including the one to which Mrs. Delaune was registered, were equipped with wheelchair accessible showers. Fourteen of the two hundred thirty-three total rooms in the hospital had been modified to accommodate handicapped/wheelchair bound patients taking showers.
[3] The American National Standards Institute (ANSI) adopted the standard "Making Buildings and Facilities Accessible to and Usable by Physically Handicapped People" with specifications applicable to public facilities constructed after January 1, 1978. La.R.S. 40:1731, et seq.
[4] The ANSI standards for new construction of bathrooms at the time that the metal ramp was installed required that the slope have a ratio of horizontal distance to rise of 12:1.