704 So.2d 1215 (1997)
Linda C. GRISSETTE
v.
Isaac Charles THOMAS, et al.
No. 96 CA 1520.
Court of Appeal of Louisiana, First Circuit.
November 7, 1997.
*1216 Marvin E. Owen, Baton Rouge, for Plaintiff/Appellant Linda C. Grissette.
Charles A. Schutte, Jr., Baton Rouge, for Intervenor/Appellee Commercial Union Insurance Company.
Edward F. Stauss, III, Baton Rouge, for Defendants/Appellees Isaac Charles Thomas, Exxon Corporation and Ranger Insurance Company.
John R. Walker, Lafayette, for Defendant/Appellee R.L. Hall and Associates, Inc.
Before FOIL, WHIPPLE and KUHN, JJ.
KUHN, Judge.
In this tort action, plaintiff, Linda Grissette, seeks to recover damages allegedly sustained when she slipped and fell on the concrete walkway/driveway of the exterior premises of an Exxon Tiger Mart convenience store and gas station ("Exxon station"). Suit was filed against Exxon Corporation ("Exxon"), the owner of the station; Isaac Charles Thomas (in his individual capacity and doing business as "Exxon-Prescott at Airline Highway"), the operator and sub-lessee of the Exxon station; and Ranger Insurance Co. ("Ranger"), a company which *1217 allegedly provided liability insurance for the Exxon station.[1] Thomas and Exxon each filed third-party demands against R.L. Hall & Associates, Inc. ("Hall and Associates"), who constructed the station and finished the concrete surface of the walkway/driveway area pursuant to a construction contract with Exxon.[2]
After a trial on the merits, the jury found that plaintiff failed to prove by a preponderance of the evidence that there was an unreasonably dangerous condition in existence at the Exxon station which caused her accident. In accordance with the jury's finding, the trial court rendered a judgment dismissing plaintiff's claims. The defendants' claims against Hall were also dismissed. Plaintiff has appealed. We affirm the trial court's judgment.

I. FACTS
During the middle of the afternoon on May 10, 1991, Grissette stopped at the Exxon station to purchase gasoline. She parked the truck she was driving next to the gas pumps under the canopied area of the station and entered the convenience store to transact a credit card payment. Sometime after she exited the store, a manager who worked at the station, Cheryl Brown, discovered Grissette sitting on the concrete walkway/driveway. Grissette reported that after she left the store, she took three to four steps on the walkway/driveway before she slipped and fell.
Brown helped Grissette return inside the store. Crates were provided so that she could sit down while waiting for an ambulance. She was transported to a hospital emergency room where her knee injury was treated. She was diagnosed as having a comminuted fracture of the right patella (a fractured knee-cap) and underwent physical therapy during the months following her fall. As of the date of trial, Grissette complained of continued pain in her right knee. Grissette also experienced lower back pain following the fall. On May 4, 1992, she was diagnosed with a disc herniation at the L5-S1 level, and subsequently underwent two back surgeries.

II. PLAINTIFF'S CONTENTIONS
On appeal, plaintiff asserts the jury erred (in answering the first interrogatory) by making a legal determination that a dangerous condition which was a cause of her accident did not exist at the Exxon station. More specifically, plaintiff asserts the record establishes the walkway/driveway presented an unreasonable risk of harm. She contends that: 1) Exxon's plans and specifications for the concrete surface of the walkway/driveway were vague and defective resulting in improper construction; 2) the manner in which the concrete was finished by R.L. Hall resulted in the surface of the concrete being slippery; 3) the walkway/driveway was not properly maintained and cleaned by Thomas; and 4) Thomas failed to take action when prior falls on the premises had been reported to store personnel. Plaintiff also asserts the trial judge erred in not granting her motion for judgment notwithstanding the verdict and a new trial.

III. ANALYSIS
Plaintiff's claims against Exxon and Thomas are based on negligence and strict liability theories of recovery. La.C.C. arts. 2315 and 2317. Under either theory, the plaintiff must prove 1) the thing which caused the damage was in the custody of the defendant; 2) the thing contained a "defect" (i.e., it had a condition that created an unreasonable risk of harm to the plaintiff); and 3) the "defective" condition of the thing caused the plaintiff's injuries. Oster v. Dept. of Transportation & Development, 582 So.2d 1285, 1288 (La.1991); Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La.1990). *1218 The plaintiff asserting negligence liability under La.C.C. art. 2315 has the additional burden of proving the defendant knew or should have known of the defect. Id. at 1112, n. 7. On appeal, the parties do not dispute whether defendants had custody of the Exxon station and driveway/walkway. Rather, they dispute whether a defective condition was present on the premises which caused plaintiff's injuries.

A. STANDARD OF REVIEW
In the present case, plaintiff asserts that the jury's finding (i.e., that plaintiff failed to establish that an unreasonably dangerous condition which caused her injuries existed on the premises of the Exxon station) is a legal determination and, therefore, subject to a de novo review rather than the manifest error or clearly wrong standard of review. Plaintiff cites Green v. City of Thibodaux, 94-1000 (La.App. 1st Cir. 10/6/95), 671 So.2d 399, writ denied, 95-2706 (La.2/28/96), 668 So.2d 366, in support of this proposition.
In Green v. City of Thibodaux, a five judge panel of this court considered whether a cracked curb presented an unreasonable risk of harm to a pedestrian, who injured her ankle when she stepped off of the curb and on to the street to watch a Mardi Gras parade. The plaintiff had consumed several beers while observing the parade and admitted inattention to where she was walking. During a lull in the parade, the plaintiff stepped up on the curb. When the floats began to move again, she stepped off of the curb back into the street. The trial court found the curb was defective and the condition of the curb was a cause in fact of plaintiff's accident and subsequent injury. The City of Thibodaux and its insurer appealed.
The Green court addressed the application of the manifest error standard of review as follows:
This manifest error standard shields the factual findings of the trier of fact on appellate review. Application of this standard creates no real problem provided said application is limited strictly to facts. For example, in this case, due deference should be given to the findings of the trial judge as to the location of the alleged defect, the size of the crack, and even the way the crack caused the plaintiff to fall. However, when all the findings of fact as to the cracked curb are made, and the trier of fact is given the benefit of the manifest error rule as to those findings, the application of those facts to the final legal determination of whether the crack constitutes a defect that creates an unreasonable risk of harm to others should not be protected on appellate review by the manifest error rule.
There is a compelling basis for this distinction. The trier of fact is in no better position than the appellate court to apply the facts, as opposed to finding the facts. Furthermore, appellate application of given facts to reach a particular legal conclusion assures uniformity of results. On the other hand, application of the manifest error standard to the ultimate legal conclusion enhances the possibility of disparate results. It increases the probability that the same facts will result in different conclusions as to whether a condition constitutes a defect.

Green v. City of Thibodaux, 94-1000 at pp. 7-8, 671 So.2d at 403.
The majority of the five-judge panel held that the trial judge's determination that a curb posed an unreasonable risk of harm to ordinary pedestrians exercising reasonable care was legally wrong.
In a dissenting opinion in Green, Judge Melvin A. Shortess opined that the manifest error standard of review was applicable, and the trier of fact's determination that the sidewalk's condition constituted a defect which posed an unreasonable risk of harm to plaintiff should have been affirmed. The majority opinion was criticized, in part, as follows:
The majority boldly holds that determining whether a defective condition presents an unreasonable risk of harm is a legal question (so a manifest error standard of review is inapplicable). I disagree. This question involves numerous factual determinations, combined with social, moral, and economic considerations. It involves, at least, mixed questions of law and fact. Whether a defective condition presents an unreasonable risk of harm is not the same *1219 as determining whether there is a duty or the scope of a duty (both true legal questions). Here, the majority has sterilely determined the ultimate issue in the case. The majority distinguishes between the duty to find facts and to apply facts. I disagree that the appellate court is in a better position to apply facts and assure more consistent results. Our supreme court has clearly stated the `the unreasonable risk of harm criterion ... is not a simple rule of law which may be applied mechanically to the facts of a case. It is a concept which requires a balancing test.' Emphasis added.

Green v. City of Thibodaux, 94-1000 at p. 1, 671 So.2d at 404 (dissenting opinion).
In Phipps v. Amtrak, 94-1876 (La.App. 1st Cir. 11/20/95), 666 So.2d 341, writ denied, 95-3012 (La.2/28/96), 668 So.2d 368, this court followed Green v. City of Thibodaux, finding that the determination of whether the design of an observation car of a train created an unreasonable risk of harm was a legal determination which was not protected on review by the manifest error rule. Also see McAllister v. Coats, 96-1069 (La.App. 1st Cir. 3/27/97), 691 So.2d 305, writ denied, 97-1356 (La.9/5/97), 700 So.2d 513; Delaune v. Medical Center of Baton Rouge, Inc., 95-1190 (La.App. 1st Cir. 10/25/96), 683 So.2d 859, writs denied, 97-0218, 97-0243 (La.3/21/97), 691 So.2d 84; Dixon v. Schwegmann Giant Supermarkets, Inc., 95-2048 (La.App. 1st Cir. 5/10/96), 673 So.2d 696. In each of these cases, this court found that the determination of whether a condition constitutes a defect that creates an unreasonable risk of harm to others is a legal determination which is not protected on appellate review by the manifest error rule.
We recognize that the Second and Third Circuits have applied the manifest error standard of review in determining whether a trier of fact erred in ruling on whether a defendant has created or maintained a thing which is an unreasonable risk of harm. See Nichols v. Wal-Mart Stores, Inc., 97-265 (La.App. 3d Cir. 7/2/97), 698 So.2d 53 (expressly declining to follow Green v. City of Thibodaux). Also see Bowen v. Skillman, 28,217 (La.App.2d Cir. 4/3/96), 671 So.2d 1216, 1218, writ denied, 96-1085 (La.6/7/96), 674 So.2d 976[3], Tullis v. Rapides Parish Police Jury, 95-905 (La.App. 3d Cir. 1/17/96), 670 So.2d 245, 248, writ not considered, 96-0444 (La.3/29/96), 670 So.2d 1241, and White v. Louviere, 95-610 (La.App. 3d Cir. 11/2/95), 664 So.2d 603.[4]
In Boyle v. Board of Supervisors, Louisiana State University, 96-1158 (La.1/14/97), 685 So.2d 1080, the Supreme Court found a small depression on the university's sidewalk did not pose an unreasonable risk of harm to others in determining that the university was not strictly liable for plaintiff's injuries. Therein, the court stated:
The strict liability imposed by Article 2317 requires the plaintiff to prove that the vice or defect of the thing is a condition which poses an unreasonable risk of harm to others. A determination of whether a thing presents an unreasonable risk of harm should be made `in light of all relevant moral economic, and social considerations.'
96-1158 at p. 3, 685 So.2d at 1082.
The Boyle court applied the risk-utility balancing test of Entrevia v. Hood, 427 So.2d 1146 (La.1983), and Langlois v. Allied Chemical Corp., 258 La. 1067, 249 So.2d 133 (1971), which requires the fact-finder to weigh factors such as gravity and risk of harm, individual and societal rights and obligations and the social utility involved in determining *1220 whether a condition presents an unreasonable risk of harm. Boyle v. Board of Supervisors, 95-1158 at p. 5, 685 So.2d at 1083.
In addressing whether the appellate court had applied the appropriate standard of review, the Supreme court stated that "[r]egardless of the standard of review that should be applied to the determination of unreasonable danger or risk of harm, ... the trial court was manifestly erroneous in its findings [that the condition of the sidewalk was a defect, that the defect was a cause in fact of plaintiff's injuries and that the university had constructive knowledge of the defect]...." Id. at p. 3, 685 So.2d at 1081-1082.[5]
In Oster v. Dept. of Transportation & Development, 582 So.2d 1285, the Supreme Court held that a drainage ditch, which was overgrown with grass and weeds and located within the Department of Transportation and Development's right of way off the travel portion and shoulder of a highway, did not present an unreasonable risk of harm under the circumstances surrounding an accident involving an off-road motorcyclist who struck the ditch while traveling at a high rate of speed through the high grass. In making this determination, the Court instructed that the unreasonable risk of harm criterion entails a myriad of considerations and cannot be applied mechanically. Id. at 1288. The Court quoted the following language from Landry v. State of Louisiana and the Board of Levee Commissioners of the Orleans Levee District, 495 So.2d 1284 (La.1986):
"the unreasonable risk of harm criterion... is a concept employed by this court to symbolize the judicial process required by the civil code. Since Articles 2317 and 2322 state general precepts and not detailed rules for all concrete cases, it becomes the interpreter's duty to decide which risks are encompassed by the codal obligations from the standpoint of justice and social utility." Reaching an intelligent and responsible decision of whether a risk is unreasonable involves consideration of moral, social and economic values as well as the ideal of justice. Citation omitted.

Oster, 582 So.2d at 1289 (quoting Entrevia v. Hood, 427 So.2d 1146 (La.1983)).
The Oster court further reasoned:
Although courts, including this court, have described the unreasonable risk of harm criterion as requiring the court to balance the likelihood and magnitude of harm against the utility of the thing, the balancing test required by the unreasonable risk of harm criterion does not lend itself well to such neat, mathematical formulations. In addition to the likelihood and magnitude of the risk and the utility of the thing, the interpreter should consider a broad range of social, economic, and moral factors including the cost to the defendant of avoiding the risk and the social utility of the plaintiff's conduct at the time of the accident.

Oster, 582 So.2d at 1289.
In examining the reasoning of the Supreme Court in Oster v. Dept. of Transportation and Development and in Boyle v. Board of Supervisors, we notice that the considerations to be made in determining whether there is an unreasonable risk of harm are totally factual ones. For example, the interpreter is to consider a broad range of social factors, a broad range of economic factors, a broad range of moral factors, the cost to *1221 defendant of avoiding the risk, and the social utility of the plaintiff's conduct at the time of the accident. The Supreme Court further suggests that reaching an intelligent decision in these considerations requires a sense of justice.
In deciding Green v. City of Thibodaux, one panel of this court concluded that declaring the determination of whether an unreasonable risk of harm exists to be a legal question would bring about uniformity in decisions. Presumably, this would mean uniformity in either the decisions of the district courts or those of the courts of appeal. However, there certainly has not been any uniformity in decisions since Green was decided, even to the extent of whether the statement of law in Green is correct.
The ultimate question to be resolved is which standard of review is best suited for cases addressing whether there is an unreasonable risk of harm. It cannot be disputed that this consideration is a mixed question of fact and law. Traditionally, Louisiana's appellate courts have conceded that the trier of fact is in an extraordinary position to answer these questions and the manifest error rule should apply to these mixed questions. Neither Green v. City of Thibodaux nor Phipps v. Amtrak presents a viable rationale to justify changing the standard of review from a well-accepted approach used justly for many, many years.
Appellate judges reading cold records are not in the best position to determine moral, social and economic values. Rather, the trier of fact is in the best position, as they are the ones to observe live witnesses who discuss the issues of life, i.e. moral, social and economic values.
In the present case, we find plaintiff failed to establish that an unreasonably dangerous condition existed at the station which was a cause of her accident. We recognize the ultimate determination regarding unreasonable danger or risk of harm may be considered as involving mixed questions of law and fact. However, regardless of the standard of review that should be applied to the determination of unreasonable danger or risk of harm, the determination made by the jury (i.e., whether plaintiff proved an unreasonably dangerous condition existed at the station which was a cause of her accident) also involves some determinations which are strictly factual (i.e., whether the finish on the concrete surface made it slippery, whether the concrete slab was improperly constructed allowing moisture to accumulate on the surface, and whether there was an oily or greasy substance on the surface of the concrete). Clearly, these factual findings are to be reviewed by this court under the manifest error standard of review

B. Presence of a Defect on the Premises

1. The Condition of the Concrete Surface

a. The finish on the surface of the concrete
Plaintiff contends that the concrete in the area where she fell was constructed improperly. She argues the concrete paving specifications provided by Exxon to Hall, who constructed the driveway/walkway, were vague and did not provide clear instructions to Hall regarding the type of finish to be applied to the surface of the concrete. She asserts that although the specifications called for one single type of finish on the exterior concrete, there were at least two separate finishes applied to the concrete, and the finish which was applied to the concrete surface where she fell was very smooth and slippery. Thus, she contends the jury misinterpreted the evidence in determining that the surface was not unreasonably dangerous.
Pursuant to the construction contract between Exxon and Hall, the concrete paving was to be finished by Hall in accordance with specifications which provided:
6.0 CONCRETE PLACEMENT
* * * * * *
6.5 FinishAll concrete subject to vehicular traffic shall have an attractive skid-resistant finish....
6.5.1 The pavement shall be struck off and consolidated with a mechanical finishing machine, vibrating screed, or by hand tools.
* * * * * *

*1222 6.5.4 Ramps, approaches, building walks, islands, island mats, and driveway slabs shall receive two passes with a steel trowel and a skid resistant finish using a light broom or burlap drag.
* * * * * *
6.5.6 All other surfaces shall be given a smooth trowel finish using the double pass method.
7.0 ACCEPTANCE
7.1 GeneralThe General Contractor shall provide a gradually sloping, homogeneous concrete pavement with an attractive, safe finish, in accordance with the specifications listed above. Any concrete determined to be substandard strength materials or finish shall be removed and replaced at no additional cost to Exxon.
Mr. Mitchell Allen Wood was accepted as an expert in the field of construction technology in architecture.[6] As of the time of trial, he was the president of a construction company, which was engaged in residential and light commercial construction and in that capacity was involved with pouring and finishing concrete. Wood testified he had reviewed the concrete plans and specifications for the station and had visited the site three times.
On his first visit to the site during July of 1995 (more than four years after the accident in question), he examined the concrete slab under the canopy areas on the north side of the station in the area where Grissette allegedly fell. He testified the concrete "was very smooth and it had a sheen, and it appeared quite dirty." He returned to the site on two other occasions. On one of the return visits, it was raining and he noticed the surface "was very shiny, very smooth ... with a sheen to it." Woods also stated that when he examined the site, there were contaminants on the concrete which felt like grime embedded in the concrete. He stated that when there is standing water on the concrete surface, which is brought into the bay area by vehicular traffic, the dirty and wet surface creates a hazardous condition. However, when questioned about the condition of the site in dry conditions, he also stated, "If it's been properly cleaned and dried, there's nothing wrong with the surface itself, a dry pavement surface."
Regarding the concrete specifications and the finish on the concrete, Wood testified that a light broom finish was an ideal surface for pedestrian traffic. He stated that the concrete surface in the area in question had a steel-troweled surface that "did not appear to have a good broom finish." He found the surface was not skid-resistant, and he considered it to be unreasonably dangerous. Wood opined that there was more than one type of finish under the canopied area. He compared a section of the walkway which he described as having a light broom finish on it to the section where Grissette allegedly fell, which he described as having the steel trowel finish. He stated that "you can see by the shadow line, [and] the sheen," it was clearly visible that the different sections of the walkway had two different finishes.
Mr. Donald W. Simpson, a civil engineer employed by Exxon who supervised the construction of the Exxon station, testified he was familiar with the plans and specifications for the station in question. He described them as the standard set of plans used for multiple Tiger Mart stations. In addressing the finish specifications, he explained the construction contract required Hall to pass over the concrete twice with a steel trowel and apply a skid resistant finish using a light broom or burlap drag. He explained this finish could be applied with a hand trowel, which is typically used on small areas. On a large surface, a whirlybird, or turning machine, is used. He explained the small hand tool would be used in the island areas, where the gasoline pumps are located, where there is not enough room for the whirlybird to pass near the columns that hold up the canopy, *1223 and possibly on the sidewalk around the building.
Simpson also explained that he understood the term "skid-resistant" to mean that some finish would be applied in addition to the two passes of the steel trowel. He described the "light broom" finish as a process whereby a push-type broom is drug over the concrete, putting fine or small grooves into the concrete. He further described an "attractive finish" as one that is smooth and does not have differences in grade.
Simpson was also involved with the construction project as an overseer of Hall's work, including the concrete pours. He explained the concrete at the station was poured in multiple pourings, and that this can cause differences in color. Upon the completion of the concrete work, he inspected it and accepted it without requiring changes to the concrete finish. He stated a light broom finish was applied to the entire surface. Simpson was satisfied with the finish on the concrete when he initially inspected it during 1986. He also inspected the concrete during the year before trial (which was held during 1995), and stated he was still satisfied with the concrete finish as of that time.
Mr. Fabian Patin, an architect who examined the site after the accident, testified that the Exxon specifications for the concrete slab and its finish were appropriate, and the concrete finish in the area where Grissette fell definitely met these specifications. He identified the area where Grissette fell as being a "classic indication of a brooming over a steel trowel finish." He explained that some variation in texture on the surface of the concrete is typical because there are many variables that can affect it, such as different weather conditions and the water content in the concrete. Although the brooming was coarser in some areas of the slab than in others, he considered all of it to have a light broom finish.
In Patin's opinion, the portion of the concrete slab where Grissette fell was a reasonably safe walking surface. He stated it was not slippery, and it was well maintained and formed well. Patin believed the sheen on the concrete was misconstrued as being a slippery surface. He described that there was "definitely a tooth on [the surface of the concrete], which made it slip-resistant." Patin acknowledged that his visits to the site occurred years after the accident, but testified that if the "wearing of the concrete during that period of time had not worn off the brooming, obviously the brooming was even more significant at the date of her fall." Patin also examined the concrete walkways/driveways at other service stations in the Baton Rouge area, and stated that the concrete finishes on the slabs at these other stations were virtually identical to the one at issue.
Mr. Hall, a civil engineer who is the owner of Hall and Associates, testified that his company has been in business for seventeen years and designs, builds, constructs and installs service station equipment, including concrete slabs. He stated Hall and Associates had constructed a number of stations for Exxon and that there was no difference between the concrete finish which had been applied at the Exxon station in question and any of the other Exxon stations constructed by Hall and Associates. He testified that the concrete was finished with two applications of the troweling machine and a "fine" or "light" broom finish. He stated he used these terms interchangeably.
After being shown a picture of the concrete slab in question, Hall addressed the different coloration in two different sections of the slab between the pump island and the entrance to the convenience store, and explained the concrete was poured at different times, approximately a month apart. He believed temperature variations had a bearing on the appearance of the concrete. He also explained that the strip of concrete adjacent to the sidewalk form was probably finished with a hand trowel rather than a troweling machine, and that this difference could also affect the appearance of the concrete. He stated both sections of the slab were finished with the same light broom finish.

b. The manner in which the concrete was constructed
Plaintiff contends moisture on the surface of the concrete caused her to fall. Mr. John *1224 M. Grimes, III, the state climatologist, testified that the day of the accident and the two previous days were particularly wet ones in Baton Rouge. However, he did not know how much rain fell at the Exxon station on the day of the accident. Although plaintiff could not recall whether it was raining at the time of the accident, she testified it had rained as she drove to the station. She also stated that after she fell, she noticed water on her clothes. Plaintiff argues that the installation of a vapor barrier under the concrete slab during construction would have prevented moisture from seeping through the concrete and would not have added any appreciable costs to the project.
Wood testified that Exxon's specifications did not require the use of a vapor barrier underneath the concrete slab. He explained that when he constructs a concrete surface which is covered, he installs a vapor barrier of visqueen underneath the slab. The barrier reduces surface condensation and evaporation through porous concrete. He explained that without the barrier, a concrete surface which is not exposed to air may develop a film on it on moist or damp days, especially if the water table is high. He explained that when this happens the concrete becomes a very slippery, hazardous surface. When questioned whether the installation of a vapor barrier would have affected plaintiff's specific fall, Wood stated:
I believe it wouldn't have hurt.... There's not a lot of scientificas far as I know, a lot of scientific study done on canopy areas with vapor barriers It's just something that we have here in Louisiana with our muggy wet conditions that any way of reducing vapor drive, any way possible, should be installed.
In contrast, Simpson testified that although visqueen is usually used under interior slabs, it is not used under exterior slabs, where open air, wind and sunlight allow moisture to evaporate.

c. Need for Corrective Measures
Plaintiff argues curative procedures should have been used to roughen the smooth concrete surface.
Wood testified that when a concrete surface is determined to be extremely smooth or slippery, two methods can be used to correct the situation. Muriatic acid can be applied to the surface to roughen it. Another more expensive method is scarifying, or sandblasting, the surface of the concrete.
Simpson testified that the use of muriatic acid on a concrete surface breaks down the top layer of the concrete, causing small holes to develop in the concrete. He explained this process would present a danger because the heel of a shoe could get caught in the holes. He was aware of one concrete surface on which the muriatic acid had been applied, causing the top layer of concrete to crumble and constantly come loose.

2. Evidence of a substance on the surface
According to plaintiff's testimony, she noticed as she exited the truck and walked towards the convenience store that the concrete surface next to the gas pumps was slippery. Because she remembered the concrete was slippery, when she stepped off of the concrete curb onto the walkway/driveway, she walked with her toes gripping her "between the toe [flip-flop]" sandals and her heels off of the ground. She took three to four steps and then fell forward onto her right knee and then backwards onto her buttocks. Grissette stated that after she fell, she noticed her clothes had "black oily grease all over them, and ... water."[7] She did not notice any puddles of oil. She testified "it was like the concrete had sweated ... with the oil, grease or whatever." She explained it had rained earlier that day and also stated that on previous visits to the station, she had noticed the concrete was "nasty" during rainy conditions. She described that she had grease all over her clothes and on her hair after she fell.
Brown, the station manager, recalled being inside the store and walking outside to help Grissette, who was sitting on the concrete surface. Grissette reported her injury to Brown, who helped Grissette into the store and assisted her by providing her with a place to sit and ice for her knee. After *1225 Brown called Emergency Medical Services and situated Grissette, Brown inspected the area where Grissette said she had fallen and observed nothing that would have caused her to slip.

3. Evidence regarding prior falls
Plaintiff asserts Thomas was negligent by failing to take corrective action after other slip and fall accidents had been reported to him.
Thomas, who operated the station for nine and one-half years, testified he was normally on the premises during the afternoon and Brown was typically on site during the day. During the nine and one-half years that Thomas operated the station, four accidents involving alleged falls had been reported to him, with Grissette's fall being one of them. Thomas testified that based on a computerized report generated from the cash register system which included a summary of sales transactions, he estimated approximately 10,500 to 11,000 customers came to the station each month.
Brown testified she did not recall any other slip and fall accidents having been reported during the four to five year period of time that she was employed at the station.
John Coleman, Grissette's brother, testified that he slipped and fell, injuring his arm, at the same station during September of 1990. He stated the weather conditions had been misty rain and he slipped on a wet area of the concrete walkway.

C. Review of Jury Finding
After reviewing the evidence considered by the jury, we find the jury must have concluded that the concrete was not slippery due to either improper finishing or construction. Likewise, the jury must have found there was no foreign substance present on the surface of the concrete which would have caused it to be slippery. Since the record supports these findings, we cannot say they are manifestly erroneous.
The jury apparently accepted the testimony of Simpson and Patin, rather than that of Wood, regarding the existence of a properly-applied, light-broom finish on the concrete surface, which was described as a reasonably-safe walking surface. The jury apparently rejected plaintiff's argument that a sheen on the concrete indicated a slippery surface. Patin described the surface as having a "tooth," and found it to be slip-resistant. He explained that a sheen on the concrete did not indicate it was slippery. Thus, we cannot say the jury erred in not finding the surface to have been slippery. The jury also likely determined that in the absence of a slippery surface, the implementation of corrective measures to roughen the concrete surface was unnecessary.
The jury apparently concluded there was no foreign substance on the surface of the concrete which caused Grissette to fall. Since the jury heard conflicting testimony from Grissette and Brown regarding whether there was a foreign substance on the surface of the concrete in the area where Grissette fell, we find no error in this finding. If the jury believed there was no foreign substance on the concrete surface, it likely concluded that the installation of visqueen was not necessary to prevent the accumulation of moisture on the concrete surface.
The jury may not have placed much weight on the testimony regarding alleged prior falls; the jury may have disbelieved that these falls actually occurred or believed that if they did occur, they were not caused by a defective finish on the concrete surface or a foreign substance on the surface. The mere fact that three other slip and fall accidents had been reported previously over a nine and one-half year period at a business that services thousands of customers each month does not establish that a defect existed on the premises on the day of Grissette's accident.
Accordingly, we find the jury did not err in finding that plaintiff did not prove by a preponderance of the evidence that an unreasonably dangerous condition existed at the Exxon station which caused her fall.

D. Motion for a JNOV or a New Trial
La.C.C.P. art. 1811 provides a party may move for a JNOV and that a motion for a new trial may be joined with this motion. A JNOV can be granted only when the trial court finds that reasonable minds could not reach a contrary verdict. The trial court *1226 can not weigh the evidence, make credibility determinations or draw inferences therefrom, or substitute its judgment of the facts for that of the jury. Belle Pass Terminal, Inc. v. Jolin, Inc., 92-1544, p. 42 (La.App. 1st Cir. 3/11/94), 634 So.2d 466, 492; writ denied, 94-0906 (La.6/17/94), 638 So.2d 1094; Autin's Cajun Joint Venture v. Kroger Co., 93-0320, pp. 9-10 (La.App. 1st Cir. 2/16/94), 637 So.2d 538, 544, writ denied, 94-0674 (La.4/29/94), 638 So.2d 224. When a motion for a JNOV is denied, the appellate court simply reviews the record to determine whether there is legal error or whether the trier of fact committed manifest error. Id.
Appellant asserts the trial judge erred by not granting her motion for a JNOV or a new trial and, therefore, allowing the jury's determination of a legal issue to stand. Our review of the record reveals no legal or manifest error. Thus, we find the trial court properly denied the JNOV.
We further find no abuse of discretion in the trial court's denial of the motion for new trial. La.C.C.P. art. 1971 et seq.; Belle Pass Terminal, Inc. v. Jolin, Inc., 92-1544 at p. 42, 634 So.2d 466, 493. In denying the motion for a new trial, the trial judge apparently determined the jury's verdict was not contrary to the law and the evidence. Based on our careful review of the evidence in this case, we cannot say that the jury erred in determining that plaintiff failed to prove an unreasonably dangerous condition existed at the station which was a cause of her accident. This assignment of error has no merit.

IV. CONCLUSION
For these reasons, we affirm the judgment of the trial court. All costs are assessed against plaintiff.
AFFIRMED.
NOTES
[1] A petition of intervention was filed by Commercial Union Insurance Company ("Commercial"), by which Commercial sought to recover workers' compensation benefits paid to Grissette as a result of injuries she sustained in the accident at issue in this suit. Commercial is not involved in this appeal.
[2] Grissette alleges in brief that she filed suit against Hall on the grounds that it did not properly construct the station. The record establishes plaintiff did not file suit against Hall. Accordingly, we do not address any of plaintiff's arguments regarding Hall's negligence.
[3] However, we also recognize that in Ebarb v. Guinn Brothers, Inc., 29,179 (La.App.2d Cir. 2/26/97), 691 So.2d 228, the Second Circuit, without mentioning Bowen v. Skillman, stated, "[w]hether there was a condition on the property which created an unreasonable risk of harm is a legal question. As such, this issue may be decided on a motion for summary judgment."
[4] In Blanchard v. State Through the Parks and Recreation Commission, 97-195, p. 8 (La.App. 3d Cir. 10/8/97), 702 So.2d 768, the Third Circuit acknowledged that it had previously stated "that the unreasonable risk of harm analysis is a factual determination and, therefore, subject to the manifest error standard of review." However, the Blanchard court also recognized that some courts have found the unreasonable risk of harm analysis to be both a legal and a factual determination. Id. at p. 8, n. 5.
[5] In Hunter v. Dept. of Transportation. and Development, 620 So.2d 1149 (La.1993), the Supreme Court indirectly addressed the issue of the standard of review to be applied to a lower court's determination that a condition posed an unreasonable risk of harm. Therein, the court reviewed the trial court's finding that the Department of Transportation and Development of the State of Louisiana ("DOTD") was liable to a plaintiff for the lack of a turning lane or a wider median to be used for left turns off of a state highway. The court considered whether the road in question presented an unreasonable risk of harm to left turning motorists. In addressing the propriety of the trial court's assessment of liability on DOTD, the court stated: "After reviewing the record, we find no manifest error in the trial judge's conclusion that the five mile section of [the highway] containing a four foot median was unreasonably dangerous to left turning motorists. We believe the record supports the conclusion that DOTD was fifty percent at fault for the accident." Id. at 1154. Thus, the Supreme Court treated the trial court's determination of an unreasonably dangerous condition as a factual finding subject to a manifest error standard of review.
[6] Wood also testified that he was an engineer, but not a professional or practicing engineer. Although he had graduated from a certified engineering college, he had not worked for an engineering firm for five years and had not qualified to sit for the licensing exam. Wood was also tendered as an expert in the sub-category of concrete finishing. However, the court found no such sub-category existed and he could not be recognized as an expert of such a field.
[7] A pair of lightly-soiled jeans were introduced into evidence.