665 So.2d 1211 (1995)
Annie Chaney MATTHEWS
v.
John FERRER, d/b/a Octave's Super News Stand, South Carolina Insurance Company, et al.
No. 95-CA-0266.
Court of Appeal of Louisiana, Fourth Circuit.
November 30, 1995.
*1212 Frank A. Milanese, Michael F. Somoza, New Orleans, and Louis B. Merhige, Metairie, for Plaintiff.
Sophia G. Pappas, New Orleans, for Defendants-Appellees.
David M. Cambre, Lozes and Cambre, New Orleans, for Defendant-Appellant.
Before LOBRANO, ARMSTRONG and WALTZER, JJ.
ARMSTRONG, Judge.
This is an appeal by one of the defendants in a trip-and-fall personal injury case. Issues are raised on appeal as to the jury's failure to find any fault by another defendant, the jury's failure to find any comparative *1213 fault of the plaintiff and quantum of damages. We affirm.
The plaintiff, Annie Chaney Matthews, a 68 year old woman, was walking on the sidewalk in University Place in downtown New Orleans. As she was passing in front of Octave's Super News Stand, an establishment run by John Ferrer, she tripped and fell. When she attempted to get up, she fell again. She was assisted by two passers-by, one of whom was a physician from out of town who testified by deposition.
It was discovered that Mrs. Matthews had fallen because her feet had become entangled in a plastic loop which was used to bundle Gambit newspapers for delivery. The loop was about a quarter inch wide, yellow in color, and made of flexible plastic. Apparently, the loop had been used to bundle approximately fifty Gambit newspapers together. It is uncontested that defendant Landmark Communications, Inc. publishes Gambit and that a Gambit delivery person dropped off bundles of Gambit in front of Octave's News Stand. Six bundles of fifty papers each would be dropped off in an alcove that led from the sidewalk proper to the front door of Octave's News Stand. They would be placed in two stacks, one on each side of the alcove, of three bundles each. Each bundle was bound with a plastic loop identical to that with which Mrs. Matthews become entangled.
The Gambit newspapers were free to anyone who wished to take one. Landmark derived its revenues from the sale of advertising in Gambit. Octave's News Stand received no compensation for the Gambit newspaper being distributed in its alcove but, instead, consented to the distribution of the newspapers there as a convenience for customers. Presumably, Octave's hoped that some of the people who stopped to pick up a Gambit would come into the newsstand to purchase something.
There is various testimony, sometimes conflicting, as to how the Gambit newspapers would come to be unbound and as to how and by whom the binding loops should be disposed of. The Gambit delivery person testified that he would remove the binding loops from the top bundle of each stack of three bundles so that two bundles would be unbound and four would remain bound. He testified that he would take the two removed binding loops and throw them in the back of his delivery truck. He admitted that, on occasion, he could have dropped a binding loop. He did not testify as to anything in particular Landmark did to provide for the disposal of the other binding loops.
Mr. Ferrer, the proprietor of Octave's news stand, first testified that he directed his employees to unbind the top two bundles and to place a piece of 2 × 4 lumber on top of them to keep the newspapers from blowing away. Later, he testified that he directed his employees to unbind all of the bundles. He also testified that his employees were instructed to put the binding loops in the trash and to pick up any loops that fell onto the ground. Sometimes, before the bundles were unbound, passers-by would remove Gambits from the bundles which, of course, would loosen the binding loops which could then fall to the ground.
Mrs. Matthews was taken to Southern Baptist Hospital after her fall. Her treating physician, Dr. Russo, testified that Mrs. Matthews suffered a colles-type comminuted displaced fracture of her right wrist and contusions of both knees. He followed her wrist injury and recovery for a period of some six months. Her injuries will be discussed in more detail below in connection with the issue of quantum of damages.
Mrs. Matthews sued both Mr. Ferrer and his insurer and also Landmark and its insurer. Mr. Ferrer and his insurer cross-claimed against Landmark and its insurer. The case was tried to a jury. The jury found Mr. Ferrer and his insurer liable. The jury found no liability of Landmark, and also found no comparative fault of Mrs. Matthews and determined her total damages to be $400,000.00. Mr. Ferrer and his insurer argue on appeal that the jury erred by: (1) finding no liability on the part of Landmark; (2) finding no comparative fault of Ms. Matthews; and (3) awarding allegedly excessive damages. Landmark, in case it might be assessed some percentage of liability on appeal, also argues that the jury erred by *1214 awarding allegedly excessive damages. Mrs. Matthews argues on appeal that the jury erred by finding no liability of Landmark.
Possible Liability of Landmark
We may disturb the jury's determination of no liability of Landmark only if that determination is clearly wrong or manifestly erroneous. Rosell v. ESCO, 549 So.2d 840 (La.1989); Stobart v. State, DOTD, 617 So.2d 880 (La.1993). The question of whether we would have reached a different result is of no moment because the issue on appeal is not whether the jury was right or wrong but, instead, whether the jury's decision was a reasonable one. Id. If two permissible views of the evidence exist, including the reasonable inferences to be drawn from the evidence, then the jury's choice between those two views cannot be clearly wrong or manifestly erroneous. Id.
We have described the relevant evidence above and, as noted, there is some conflict in that evidence. Such conflicts, of course, are primarily for the jury to resolve. Id.
Mr. Ferrer and Mrs. Matthews argue that Landmark received a pecuniary benefit by its distribution of Gambit newspapers at Octave's newsstand (and elsewhere) because, although Gambit is distributed free of charge, Landmark wishes to maximize its circulation among its target audience so as to earn advertising revenue. They contrast the comparatively lesser (as they characterize it) economic benefit that Mr. Ferrer receives from the distribution of Gambit in his newsstand's alcove (i.e., possible increased patronage from passers-by).
We do not believe that the economic benefit derived by Landmark from the distribution of Gambit at Octave's Newsstand, even if that benefit is greater than whatever benefit is received by Mr. Ferrer, renders clearly wrong or manifestly erroneous the jury's determination as to Landmark's lack of liability. Although Mr. Ferrer and Mrs. Matthews argue on appeal that Landmark was negligent, the jury did not have to conclude that Landmark was negligent just because it received a pecuniary benefit. Indeed, it would seem entirely proper for the jury to focus on the hazard presented by the binding loop and the question of which party was responsible for its presence on the sidewalk.
Mr. Ferrer and Mrs. Matthews also argue that the binding loop at issue originated with Landmark. That is apparently correct because it is uncontested that the binding loops are placed on the bundles of Gambit newspapers by Landmark and the bundles are delivered by Landmark. But, the issue is not really the ultimate origin of the binding loop, which is perfectly harmless under most circumstances, but its presence on the sidewalk. Based upon its resolutions of the somewhat conflicting evidence, the jury reasonably could conclude that it was Mr. Ferrer's employees who, by reason of a failure on their part to clean up the binding loops in the alcove of the newsstand, were responsible for the presence of the binding loop on the sidewalk. The bundles of Gambit newspapers had been delivered in the morning, perhaps early in the morning, and the accident occurred between noon and 1:00 p.m., so the jury reasonably could conclude that newsstand employees had the opportunity to clean up any loose binding loops before the accident occurred. We therefore cannot say that the jury's determination was, under the Rosell and Stobart standard of appellate review, clearly wrong or manifestly erroneous.
Possible Comparative Fault of Mrs. Matthews
Mr. Ferrer argues that the jury was clearly wrong and manifestly erroneous in failing to find any comparative fault on the part of Mrs. Matthews. We can summarize Mr. Ferrer's argument as being that, if Mrs. Matthews had been careful, then she would have seen the binding loop and avoided it.
The degree of care legally required of a pedestrian can be described generally as reasonable care, such as would be exercised by a reasonable, prudent person under the same or similar circumstances, but not necessarily perfect care. Put another way, Mrs. Matthews was required to give reasonable attention to the sidewalk ahead of her, to see if it was free of hazards. However, *1215 she did not need to focus all of her attention on the sidewalk at all times, as other aspects of her journey also would require some attention. See generally Scamardo v. New Orleans Stevedoring Co., 595 So.2d 1242 (La.1992); Bessard v. State, DOTD, 645 So.2d 1134 (La.1994); Soileau v. South Central Bell Telephone Co., 406 So.2d 182 (La.1981); White v. City of Alexandria, 216 La. 308, 43 So.2d 618 (1949).
Thus, the issue becomes the factual one of whether Mrs. Matthews was exercising reasonable care at the time of the accident. The jury's evident conclusion that Mrs. Matthews was exercising reasonable care, but that the accident occurred anyway, can be disturbed on appeal only if it is clearly wrong or manifestly erroneous. Rosell v. ESCO, supra; Stobart v. State, DOTD, supra. See also Watson v. State Farm Fire and Casualty Ins. Co., 469 So.2d 967 (La. 1985) (jury's determination of comparative fault subjected to clearly wrong standard of review).
There is relatively little evidence that goes directly to the issue of Mrs. Matthews' exercise of reasonable care. Mrs. Matthews testified that she was looking toward Canal Street, the direction in which she was headed, but that she was looking where she was going. Photographs of the site of the accident were introduced into evidence and show a typical downtown sidewalk which, at the noon hour time of the accident, would have been filled with many pedestrians. A binding loop was shown to the jury and described by Mrs. Matthews as being identical to that with which she became entangled, but was not introduced into evidence. Thus, unlike the jury, we do not know precisely what the binding loop looked like.
Mr. Ferrer points out that, when the representative binding loop was described by Mrs. Matthews as being identical to that with which she became entangled, she testified: "Yes, it looked just like that. Yes, and the color. The color was yellow. No way I could miss that." (emphasis added). Mr. Ferrer points out that Mrs. Matthews said there was "no way I could miss that" and argues, in effect, that she had conceded that she should have seen the binding loop before the accident. However, we think that, when read in context, it is clear that Mrs. Matthews was relating her actual observation after her fall, when the binding loop was removed from her feet. Her choice of words in her testimony simply conveyed her conviction that she could not be mistaken that the binding loop she was shown in court was identical to the one she saw taken from her feet immediately after her fall.
There were no witnesses, other than Mrs. Matthews herself, who testified as to what she was doing or what care she was exercising immediately before she fell. To a great extent, the factual determination as to Mrs. Matthews' exercise of care must be based upon an evaluation of her credibility. That is primarily the responsibility of the jury. See Rosell v. ESCO, supra; Stobart v. State, DOTD, supra. Additionally, it was possible for the jury to draw inferences from the binding loop shown at trial, and from the photographs of the accident scene, as to whether Mrs. Matthews should have seen the binding loop on the sidewalk before her accident. So long as such inferences are reasonable, they are proper. Id.
We cannot say that the jury was clearly wrong or manifestly erroneous in finding no comparative fault of Mrs. Matthews.

Quantum of Damages
Mr. Ferrer and Landmark argue that the $400,000.00 damages awarded by the jury is excessive and should be reduced. The $400,000.00 was a total, lump-sum award for all damages, both special and general.
The record reflects medical bills totaling about $5,411.48. At the time of the accident Mrs. Matthews earned $120 a week. After the accident she was unable to work for about four and one-half months. She returned to work in mid-September 1990, but her earnings decreased to $60.00 per week as she was physically unable to do as much as before the accident. She stopped working altogether in February 1994 as she felt she could not do all the work required by a new prospective employer. It appears that Mrs. Matthews' special damages, medical expenses *1216 and past lost wages, are in the range of $15,000.00 to $20,000.00.[1]
Thus, the jury's determination of $400,000.00 damages includes a component of at least $380,000 general damages. Mr. Ferrer and Landmark argue that this $380,000.00 general damages awarded is too high.
The standard for appellate review of the quantum of an award of general damages requires a two-step process. First, the appellate court must determine whether there has been an abuse of the finder of fact's (in this case, the jury's) discretion in determining the amount of general damages. Second, if the appellate court does find such an abuse of discretion, then prior awards of general damages for similar injuries may be examined to determine the greatest or least (as the case may be) amount that the finder of fact reasonably could award. Theriot v. Allstate Ins. Co., 625 So.2d 1337, 1340 (La.1993); Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1260-61 (La.1993), cert. den., ___ U.S. ___, ___, 114 S.Ct. 1059, ___, 127 L.Ed.2d 379 (1994).
In the present case, with respect to the first of the two steps mandated by the Youn and Theriot cases, we find that the jury has not abused its "vast", see Youn, supra, discretion in determining the amount of general damages. Accordingly, we need not go on to the second step of comparing the general damages determination in this case to general damages awards in past cases of similar injury.
The break in Mrs. Matthews' right wrist was not a simple fracture but was a more severe "Colles" type comminuted displaced fracture. The end of the radius bone was broken into a number of pieces. Thus, it was not sufficient to merely place the wrist in a cast. Instead, metal pins had to be inserted in Mrs. Matthews' arm so that the bones would heal properly. This procedure required general anesthesia. Some weeks later, these metal pins had to be removed.
Even after the metal pins were removed, Mrs. Matthews had to wear a cast for several more weeks. Both before and after the metal pins were removed, Mrs. Matthews had to keep her arm elevated and pointing straight up, because of problems with swelling of her arm.
The record, including the testimony of one of Mrs. Matthews' sisters, establishes that Mrs. Matthews suffered great pain at the time of breaking her wrist and for weeks or even months thereafter.
For some weeks or even months after her fall, Mrs. Matthews was unable to care for herself. Her sisters had to care for her, including her personal bodily needs, "like a baby" as one of her sisters described it.
Nor was the broken wrist Mrs. Matthews' only injury. The fall caused contusions of both knees, which contusions eventually resolved, but the knee injuries aggravated a pre-existing arthritic condition in both knees. The resulting pain and inflammation could not be treated with medications, as would usually be the case, because of a stomach condition she had.
The broken wrist has left Mrs. Matthews with some residual impairment which limits her activities. Her wrist is expected to continue to trouble her and cause her pain indefinitely. Perhaps more importantly, the aggravation of the pre-existing arthritic condition in her knees has impaired her mobility and curtailed her life style. Prior to her injury, Mrs. Matthews not only worked several jobs but, also, cooked meals at her church and engaged in other church activities as an important part of her life. She used public transportation for all of these activities. With the injury, and the continuing impairment to her knees, she is no longer able to make the same use of public transportation and engage in all of her former activities.
Based upon the record as to Mrs. Matthews' injuries, we cannot say that there was a clear abuse of the jury's "vast", see Youn, supra, discretion as to the quantum of general damages. Under the very limited appellate review we are permitted to conduct, under the Youn and Theriot decisions of the Supreme Court, we may not disturb the *1217 jury's determination of general damages in this case.

Conclusion
For the foregoing reasons, the judgment of the trial court is affirmed.
AFFIRMED.
WALTZER, J., concurs with reasons.
WALTZER, J., concurring with reasons.
I respectfully concur and write separately concerning the general damage award of the jury which we affirm on review.
It is important to note that Ms. Matthews was 68 years old at the time of the accident. By the time the trial took place she was 72 years of age. The jury saw her testify and took her age into consideration. Traditionally, elderly injury victims have received smaller damage awards than younger people, because juries accepted the argument that the elderly endure pain and suffering for less time than young victims. With people living longer, this jury may well have measured damages for the 72 year old Mrs. Matthews on the quality of her remaining years, not just the number.
NOTES
[1] No evidence was presented at trial of future lost wages.