845 So.2d 1238 (2003)
Phyllis F. WAKEFIELD & Robert F. Wakefield
v.
RELIANCE NATIONAL INDEMNITY COMPANY, Marmac, L.L.C. d/b/a, McDonough Marine Service and Dayla K. Walkowski.
No. 02-CA-1173.
Court of Appeal of Louisiana, Fifth Circuit.
April 29, 2003.
*1240 Scott G. Jones, Hulse & Wanek, New Orleans, LA, for Defendant/Appellant, Fidelity And Casualty Company.
Wayne M. LeBlanc, Metairie, LA, for Plaintiffs/Second Appellants, Phyllis F. Wakefield and Robert E. Wakefield.
Robert M. Johnston, Law Ofice of Robert M. Johnston, LLC, New Orleans, LA, for Defendant/Appellee, Liberty Mutual Insurance Company.
Thomas D. Fazio, McCollister & McCleary, Baton Rouge, LA, for Defendant/Appellee, Louisiana Insurance Guaranty Association.
P.M. Donovan, Donovan & Lawler, APLC, Metairie, LA, for Defendants/Appellees, Marmac, LLC d/b/a McDonough Marine Service and Dayla K. Walkowski.
Panel composed of Judges SOL GOTHARD, THOMAS F. DALEY and WALTER J. ROTHSCHILD.
THOMAS F. DALEY, Judge.
This suit for personal injuries arises out of an automobile accident that occurred on July 8, 2000, at the intersection of Veterans Boulevard and Transcontinental. Defendant, Dayla Walkowski (Walkowski), was operating a vehicle owned by her employer, McDonough Marine Services, Inc., a division of Marmac, LLC (McDonough), when she struck the vehicle of the plaintiffs, Phyllis and Robert Wakefield. Mrs. Wakefield, who was 75 years old at the time of the accident, sustained a serious compound wrist fracture that necessitated several surgeries.
The Wakefields filed suit against Walkowski, McDonough, and its automobile liability insurer Reliance National Indemnity Company (Reliance). Plaintiffs added their own uninsured/underinsured motorist carrier, Fidelity and Casualty Company of New York (Fidelity), by way of Amended *1241 Petition. In June of 2001, the Pennsylvania authorities placed Reliance into receivership, staying all proceedings against it. By a Second Amended Petition, the plaintiffs added Liberty Mutual Fire Insurance Company, Walkowski's personal automobile liability carrier and umbrella policy carrier. Plaintiffs also filed a Third Amended Petition, adding the Louisiana Insurance Guaranty Association (LIGA) in place of Reliance.
Prior to trial, insurance coverage issues were decided in summary judgment proceedings, with the trial court ruling that Walkowski's personal Liberty Mutual primary auto liability did not provide coverage for this accident, but leaving the issue of the umbrella policy's coverage for trial. Walkowski's liability was stipulated at trial. At the bench trial, the judge found that the "business pursuits" exclusion in the Liberty Mutual umbrella policy applied, excluding coverage for this accident and leaving Fidelity, the plaintiffs' UM carrier, as the applicable insurance. The trial judge awarded Mrs. Wakefield $150,000.00 in general damages and $39,537.00 in past medical expenses. He also awarded Mr. Wakefield $15,000.00 for loss of consortium.
Defendant, Fidelity, appeals the trial court's finding that they and not Liberty Mutual Insurance Company, Ms. Walkowski's personal liability and umbrella carrier, provided coverage for this accident. Fidelity also assigns as error the trial court's admission into evidence of a "day in the life" video of plaintiff, Phyllis Wakefield, arguing that it was prejudicial. They argue that the trial court's award of $150,000.00 in general damages to Mrs. Wakefield was excessive. They also argue that no evidence supports an award to Mr. Wakefield for loss of consortium. The Wakefields also appeal, arguing that the trial court erred in assigning Mrs. Wakefield only a 29% disability rating, failing to itemize the damages after they requested it, awarding inadequate damages to Mrs. Wakefield, awarding inadequate loss of consortium damages to Mr. Wakefield, and failing to cast the tortfeasor, Dayla Walkowski, in judgment.
After thorough consideration of the record and applicable law, we affirm the judgment of the trial court.

INSURANCE COVERAGE
At the time of the accident, Walkowski was driving a vehicle her employer, McDonough, owned and that was regularly furnished for her use on a 24-hour basis. McDonough had in force and effect a policy of automobile liability insurance with Reliance National Indemnity Company. After the Wakefields filed this suit, but before the matter was tried, Reliance was placed into receivership and LIGA thereafter stood in their position. At this point, the question of insurance coverage came to the forefront. Under the LIGA law, LSA-R.S. 22:1375 et seq, Louisiana law requires any other available liability, UM, or medical expense coverage to be exhausted before the coverage provided to the insured of an insolvent insurer under the LIGA law is triggered. In addition to the Reliance policy on the work-owned automobile that she was driving, Ms. Walkowski also had a personal automobile liability policy, as well as an umbrella policy with Liberty Mutual. The Wakefields had uninsured motorist coverage of their own through Fidelity.
Liberty Mutual filed a Motion for Summary Judgment not only on the underlying automobile liability policy, but also the umbrella policy, arguing that there was no *1242 coverage for this accident under either policy. The trial court ruled that the underlying automobile liability policy of Liberty Mutual did not apply because of the "regularly used non-owned vehicle" exclusion. As far as the Motion for Summary Judgment related to the umbrella policy's exclusion, which was different from that of the primary policy, the court denied the motion, stating that there were questions of fact as to whether or not the "business pursuits" exclusion would apply in the instant case.
At trial, the court found that Walkowski was in the course and scope of her employment at the time of the accident, which triggered the "business pursuits" exclusion in the umbrella policy, excluding coverage for the accident. Fidelity appeals this finding,[1] arguing that Walkowski's deposition testimony, which they argue conflicted with her trial testimony, showed that she had finished her employment-related mission at the time of the accident and was in fact on her way to get lunch.
Liberty Mutual's umbrella policy contained an exclusion to coverage for "personal injury or property damage: b. arising out of business pursuits or business property unless the liability is covered by an underlying policy." "Business pursuits" means any activities of a business, trade, occupation or profession except the providing of professional services. "Underlying policy" means a policy listed as an underlying policy in the Declarations. Liberty Mutual's primary automobile liability policy is listed on the excess policy's underlying policy schedule, and excludes coverage when the insured is using any vehicle while employed or otherwise engaged in any business.[2]
Fidelity argues that it has long been held that, as a general rule, an accident that occurs while an employee is on his way to or from the lunch hour is not considered to have occurred within the course and scope of that person's employment, citing Brown v. Ackel, 00-287 (La. App. 5 Cir. 07/25/00) 767 So.2d 827 and Hall v. House, Golden, Kingsmill & Riess, et al, 97-988 (La.App. 5 Cir. 5/27/98), 717 So.2d 250, writ denied 98-2195, 729 So.2d 565 (La.11/25/98).
Walkowski's deposition testimony and her trial testimony established that the accident occurred on a Saturday. Walkowski had been Operations Manager at McDonough for 21 years. Her duties consisted primarily of dispatching barges, renting barges, and barge repairs. The company-owned automobile was furnished for her use 24 hours per day, 7 days per week. She testified that she was a salaried employee, not hourly, and was on call 24 hours per day. On this Saturday, July 8, 2000, she had gone into the office around 8:30 or 9:00 a.m. to catch up on work, but left to purchase wrapping paper at Wal-Mart on Veterans Highway for a gift for a retiring employee. Previously, Walkowski had purchased a gift for this retiring employee out of personal funds that were reimbursed to her by McDonough. McDonough also reimbursed her for the cost of the wrapping paper. She and other employees from the Metairie office would fly to Houston that afternoon on the company's private aircraft to attend *1243 the retirement party. She intended to leave directly from the office for the party.
Walkowski was on her way back to the office from Wal-Mart when the accident occurred. She testified at trial that she got an hour for lunch every day, and performed this work-related errand on what she considered to be her lunch hour, though it was a Saturday. She testified that in her 21 years at McDonough, she had in the past performed similar "human resource" type duties and considered them part of her job. Fidelity argues that in her testimony, Walkowski indicated that she intended to pick up her lunch (and pay with personal funds) before returning to the office from getting the wrapping paper. It is undisputed that she had not yet purchased the lunch when the accident occurred, but was heading back in the direction of her office. At trial, she said that she had not yet determined where she would get her lunch, but it probably would have been at some fast food place between Wal-Mart and her office, which was located near Clearview and Veterans. The evidence shows that she had not deviated in her route back to the office when the accident occurred. (In fact, she did not get lunch at all after this accident occurred.)
Walkowski's testimony in her deposition is not materially different from her trial testimony. In arguing this assignment, Fidelity cites more often to Walkowski's trial testimony. Fidelity argues that Walkowski's testimony, that she intended to pick up some lunch prior to returning to the office after getting the wrapping paper, takes her out of the course and scope of her employment at the time the accident occurred. The trial court found, however, that Walkowski was clearly on an employment-related mission at the time the accident occurred.
The well-settled rule of law is that an appellate court cannot reverse a trial court's findings of fact in the absence of manifest error or unless they are clearly wrong. Stobart v. State, Through DOTD, 617 So.2d 880 (La.1993); Rosell v. ESCO, 549 So.2d 840 (La.1989). On appeal, the appellate court must review the record in its entirety to determine whether the trial court's findings were clearly wrong or manifestly erroneous and whether the trial court's conclusions were reasonable. Stobart, supra.
As noted by Fidelity in brief, most of the cases involving determination of whether an accident causing injury to an employee occurring during a time of travel took place within the course of employment have involved accidents that occurred while the employee was on his way to or from work, or on his lunch hour. As a general rule, such accidents are not considered to have occurred within the course of employment. Brown v. Ackel, supra.[3] However, jurisprudential exceptions to that rule have developed, as we noted in Brown v. Ackel, supra:
1) If the accident happened on the employer's premises;
2) If the employee was deemed to be on a specific mission for the employer, such as making a trip in the interest of his employer's business or pursuant to his employer's order;
3) If the employer had interested himself in the transportation of the *1244 employee as an incident to the employment agreement either by contractually providing transportation or reimbursing the employee for his travel expenses;
4) If the employee was doing work for his employer under circumstances where the employer's consent could be fairly implied;
5) If the employee was hurt while traveling to and from one work site to another;
6) If the employee was injured in an area immediately adjacent to his place of employment and that area contained a distinct travel risk to the employee, also known as the threshold doctrine; and,
7) If the operation of a motor vehicle was the performance of one of the duties of the employment of the employee.
Each case must be decided upon the particular facts and circumstances. Walkowski's activities fall within the second exception listed above. Fidelity concedes that getting the wrapping paper was a work-related errand, but argue that she was on her way to get lunch, something not in the course and scope of her employment. We find that though she had intended to get lunch, she had in fact not done so. Walkowski also intended to return to the office and the testimony reflects that she had not deviated in her route back to the office from Wal-Mart. She had not yet acted upon her intent to purchase lunch, but was traveling the same route she would have used to return directly to the office from the work-related errand. In the instant case, we find no manifest error in the judge's conclusion that Walkowski was in the course and scope of her employment when this accident occurred.
Fidelity argues that the "business pursuits" exclusion in the umbrella policy has been found unenforceable, citing Marcus v. Hanover Ins. Co., 98-2040 (La.6/4/99), 740 So.2d 603. Fidelity argues that the business pursuits exclusion operates to cause the vehicle to drive in and out of coverage depending on the particular mission on which the driver is engaged. The Marcus court, however, found the business use exclusion to be contrary to the public policy stated in LSA-R.S. 32:851, et seq, when it excluded from coverage the named insured while operating his personal car. The Supreme Court noted that the statutory scheme was intended to attach financial protection to the vehicle rather than to the operator. In the instant case, Walkowski was not operating her personal car, insured under the two Liberty Mutual policies, on a business outing; she was operating her employer-owned vehicle on a business outing and was at all times covered under the Reliance liability policy.[4] The particular public policy considerations that the Marcus court faced are not present here. The trial court did not err in distinguishing this case from Marcus and, therefore, declining to invalidate the business pursuits exclusion in the Liberty Mutual umbrella policy.

ADMISSIBILITY OF VIDEOTAPE
At trial, plaintiffs introduced into evidence, over Fidelity's objection, a videotape entitled "A Day in the Life of Phyllis Wakefield." Fidelity objected to the introduction *1245 of this tape on the grounds that it consisted of a running commentary by the plaintiff that was not subject to cross-examination. In addition, they argued that it was clear the plaintiff was given instructions by someone who was off camera. Fidelity also objected on the grounds that the videotape was made on April 6, 2001, more than a year before the trial, which took place in June of 2002, and, therefore, did not accurately depict the plaintiff's condition at trial.
The determination of whether videotapes are admissible is largely within the discretion of the trial court. The admissibility of a videotape is determined on a case-by-case basis depending on the individual facts and circumstances of each case. Fryson v. Dupre Transport, Inc., XXXX-XXXX (La.App. 4 Cir. 8/29/01), 798 So.2d 1012. The factors to be considered in order to determine admissibility of a videotape are as follows: (1) whether the videotape accurately depicts what it purports to represent, (2) whether it tends to establish a fact of the proponent's case, and (3) whether it will aid the jury's understanding. Id.
First, it is important to note that this was a bench trial, not a jury trial. The likelihood of prejudice is much less under these circumstances. Second, the plaintiff testified at trial and was cross examined regarding the videotape, the circumstances under which it was made, and the differences in, and improvement to, her condition by the time of trial. Plaintiff's physical therapist also testified about the plaintiff's improvement since the videotape was made, and her condition at the time of trial. Under the circumstances of this case, we find that the introduction of this tape was not so prejudicial that its admission was error. See also Reggio v. Louisiana Gas Service Co., 333 So.2d 395 (La. App. 4 Cir.1976).

DISABILITY RATING AND ITEMIZATION OF DAMAGES
The Wakefields argue that the trial court erred in its factual finding that Mrs. Wakefield suffered only a 29% percent upper body disability rating. They point out that Dr. Kaye, Mrs. Wakefield's treating physician, sent a letter to the court, after his deposition, wherein he assigned a 41% impairment to her upper extremity and a 25% impairment to the whole person. At his deposition, which was offered in lieu of his live testimony, he estimated 20% impairment to the upper extremity, 12% to the whole person, but qualified his answer because he had not calculated the impairment, according to medical reference books, prior to his testimony. Plaintiff argues that the trial court's finding of 29% is without foundation. She further disagrees that it was ever stipulated that her carpal tunnel symptoms were unrelated to the accident.
It does not appear that the trial court awarded damages relative to a certain impairment level. When he awarded damages, the trial judge compared the plaintiff's injuries to the plaintiff in Stephens v. Town of Jonesboro, 25,715 (La.App. 2 Cir. 8/19/94), 642 So.2d 274. The plaintiff in that case was left with a 30% impairment to the upper extremity. She was awarded $300,000.00 in general damages, but also experienced additional serious injuries. The trial court also noted that it had found cases where plaintiffs suffered similar kinds of injuries as plaintiff's that had damage awards that ranged from $60,000.00 to $400,000.00. This court has also found cases in this range, and many of them do not set a numerical impairment rating. So, while plaintiffs argue the trial *1246 court's finding of a 29% upper extremity disability rating was incorrect, it does not appear that the trial court relied exclusively on that finding to set a damage award. We do not find that any corrective action is necessary with regard to the trial court's disability rating.
Likewise, the plaintiff assigns as error the trial court's failure to itemize its in globo award of damages. There is no requirement that the trial court do so. In fact, several cases that the plaintiffs cites in support of her claim for inadequate damages included in globo awards.

DAMAGES
Fidelity argues that the award of $150,000.00 in general damages to Phyllis Wakefield is clearly excessive. Plaintiff argues that the same damage award is inadequate, and asks that it be increased. Each side makes the same arguments regarding Mr. Wakefield's loss of consortium award of $15,000.00.
The accident occurred on July 8, 2000. Plaintiff was 75 at the time, and suffered a compound fracture of the wrist, necessitating four surgeries, the use of an external fixator for six weeks, and a cast after that. Pictures of her hand show that Mrs. Wakefield's wrist is misshapen and will remain that way. Her treating physician, Dr. Jefferson Kaye, testified via deposition that she has a non-union of the bone, due to the fact that her bones were very soft. He testified in deposition that he could not relate her carpal tunnel problems to this accident. He described the surgeries he performed on Mrs. Wakefield's hand and her follow-up treatment.
While she was in the fixator and cast, the plaintiff engaged in occupational therapy to rehabilitate her hand. She last saw the occupational therapist in March of 2001. Jennifer Breaux, the therapist, testified that Mrs. Wakefield was a good patient who applied herself to her therapy, and that she had met her therapy goals by the time she was discharged from Breaux's treatment. Breaux agreed, though, that Mrs. Wakefield has some residual pain and loss of function.
Mrs. Wakefield testified regarding the accident, her medical treatment, and the current condition of her hand. She said that she has trouble buttoning buttons, putting on her earrings, tying her shoes, and performing household cleaning tasks such as dusting, vacuuming, and slicing vegetables and fruit. Her testimony conflicted in part with the testimony of Jennifer Breaux, whose notes indicated that plaintiff reported being able to button buttons, tie shoes, and put in earrings. Breaux testified that the therapy goals concentrated on getting Mrs. Wakefield to be able to perform the tasks of daily living and that these goals had been met.
Mrs. Wakefield testified that she had to rely on her husband to perform many of these tasks. She also reported that she was no longer able to paint pictures, a leisure activity she had enjoyed before the accident. Her testimony, as well as her daughters' testimonies, showed that she was a relatively prolific painter, but had only been able to paint two pictures since the accident. She also had some trouble starting the car and had to use a pliers to hold the key.
Mrs. Wakefield's testimony also showed that she was affected by a plethora of pre-existing medical conditions, including heart surgery, diabetes, thyroid dysfunction, arthritis, and prior back and knee surgery. Some of her mobility and ability to exercise had already been limited by these conditions, as well as providing a limited *1247 need for pain medication prior to the accident.
The discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993).
We find that the damage award to Mrs. Wakefield was neither abusively low nor excessive. Plaintiff cites several cases that argue for an increase in the damages to $300,000.00 or $400,000.00, but our reading of these cases show that those plaintiffs suffered serious injuries to other body parts in addition to their wrist injuries[5], or the hand injury itself was more serious, with the loss of fingers.[6] We find all these cases distinguishable on those bases.
The trial court cited Stephens v. Town of Jonesboro, supra, as support for its damage award. In that case, plaintiff Alberta Doyle was awarded $300,000.00 in general damages. She suffered a Colles fracture of the right wrist that resulted in a 30% impairment. In addition, she suffered a broken leg that resulted in a 50% impairment and would require a future knee replacement. Additionally, she suffered a degloving injury to her eyelid approximately half-way to her scalp that required surgery and resulted in a permanent eyelid droop. While we do not make light of Mrs. Wakefield's injuries nor the impact they have had on her life, clearly her injuries were not as extensive as Ms. Doyles's.
In Blitz v. Jefferson Parish Hospital Service District No.2, 93-733 (La.App. 5 Cir. 4/14/94, 636 So.2d 1059). The 77 year old plaintiff sustained a severely comminuted fracture of her left wrist, as well as fractures of three ribs, and muscle and ligament damage to her shoulder, back, pelvis, and knees. A panel of this court raised her in globo damage award to $160,000.00, which included $54,650.00 in special damages.
In Treadaway v. Shoney's, Inc., 93-1688 (La.App. 4 Cir. 2/25/94), 633 So.2d 841, plaintiff sustained a severe fracture to her left wrist that required two surgeries and an external fixator. She underwent many hours of physical therapy and had to rely extensively on her husband to perform household tasks while she wore the fixator. The court of appeal approved a $62,500.00 award for pain and suffering, citing Youn, supra (her total damages were $128,874.61).
In Boddie v. State of Louisiana, 27,313 (La.App. 2 Cir 9/27/95), 661 So.2d 617, plaintiff suffered a badly broken left wrist and arm. She required surgery and an external fixator for 8-9 weeks. She contracted an infection. The fixator scarred *1248 her arm, caused her a great deal of pain, and left her arm crooked. She underwent physical therapy, but testified that she had not regained total use of her arm. Plaintiff had preexisting multiple sclerosis. The injury caused her a 14% impairment to her arm. She was awarded $95,000.00 in globo in general damages, which the court of appeal affirmed. See also Creel v. St. Charles Gaming Co., Inc., 97-994 (La. App. 3 Cir. 2/4/98), 707 So.2d 475 (serious wrist fracture, surgery, external fixator, and physical therapy, without full recovery-$75,000.00 in general damages).
Accordingly, we find that the trial court did not abuse its vast discretion in fashioning this damage award to Mrs. Wakefield.
Plaintiff and defendant both appeal the loss of consortium award to Mr. Wakefield. Fidelity argues that the award is excessive, given Mr. Wakefield's scant testimony (3 pages of trial transcript), and that no award is justified. The plaintiffs argue that this award is grossly inadequate and ask that it be raised to $50,000.00.
The record reflects that Mr. Wakefield and his wife are both in their mid to late 70s. Mr. Wakefield has been diagnosed with the early stages of Alzheimer's disease, but remains at home and apparently functions well at this time. He testified that he had to help his wife bathe and address her personal needs soon after the accident, and that he continues to help her around the house with the chores she would have normally done. Mrs. Wakefield testified that they have a maid every other week and do the cleaning themselves on the off weeks, an arrangement that pre-dated the accident. Mr. Wakefield also helps Mrs. Wakefield with her earrings, buttons, and shoelaces on occasions when she needs it, the frequency of which varies depending on what she wears.
Though his testimony was scant, the record supports a finding that Mr. Wakefield has sustained a loss of services, the work that he does around the house that she used to be able to perform. The record tends to show that this is not a huge amount of work, but it is a loss nevertheless. The record also shows that Mrs. Wakefield was able to take care of herself before the accident and looked forward to being able to care for Mr. Wakefield at home as his Alzheimer's progressed, but her ability to take care of herself is now limited and certainly her ability to take care of him eventually has been diminished as well.
Though generous, we do not find that this loss of consortium award was abusively high, nor abusively low. We affirm this award.

JUDGMENT AGAINST TORTFEASOR
The plaintiffs argue that there is no basis for not holding the tortfeasor liable when LIGA makes its appearance, and that this is mentioned for "completeness" should the coverage of LIGA be applicable to this accident.
The LIGA law, LSA-R.S. 22:1375 et seq., requires any other available liability, UM, or medical expense coverage to be exhausted before the coverage provided to the insured of an insolvent insurer under the LIGA law is triggered. Since this damage award does not exceed the applicable insurance coverage under Fidelity's policy, we need not reach this issue.
Accordingly, for the reasons assigned, we affirm the trial court's judgment.
AFFIRMED.
NOTES
[1] Fidelity does not appeal the trial court's judgment that coverage is excluded under the Liberty Mutual primary automobile liability policy.
[2] See Footnote 1.
[3] Though this case is postured as a workers' compensation case, the principles of law are applicable here.
[4] It is only because Reliance was placed in receivership and replaced with LIGA that the coverage questions here became issues.
[5] Delaune v. Medical Center of Baton Rouge, 95-1190 (La.App. 1 Cir. 10/25/96), 683 So.2d 859; Matthews v. Ferrer, 95-0266 (La.App. 4 Cir. 11/30/95), 665 So.2d 1211; Ford v. State of Louisiana Through DOTD, 99-1297 (La. App. 3 Cir. 4/12/00), 760 So.2d 478; Detraz v. Hartford Accident & Indemnity Co., 94-708 (La.App. 3 Cir. 12/17/94), 647 So.2d 576.
[6] Head v. Pendleton Memorial Methodist Hospital, 95-0461 (La.App. 4 Cir. 1/31/96), 669 So.2d 504.