882 So.2d 751 (2004)
Barbara RICE, and Erma Morace, Individually, as Heirs of Laura Loraine Miller, Plaintiffs-Appellees
v.
Douglas M. LILES, M.D., Defendant-Appellee.
No. 38,840-CA.
Court of Appeal of Louisiana, Second Circuit.
September 24, 2004.
Hudson, Potts & Bernstein, LLP, Gordon L. James, Jay P. Adams, Monroe, for Appellant, Louisiana Patients Compensation Fund.
Oscar L. Shoenfelt, III, Baton Rouge, for Appellees, Barbara Rice and Erma Morace, Individually, as Heirs of Laura Loraine Miller.
David E. Verlander, III, Monroe, for Appellee, Douglas M. Liles, M.D.
Before WILLIAMS, CARAWAY and DREW, JJ.
DREW, J.
Quantum is the sole issue in this appeal by the Louisiana Patient's Compensation Fund (LPCF) from the medical malpractice award of $481,132.22 plus interest and costs. Loraine Miller died at age 78 on August 23, 2002, from causes unrelated to this dispute. Her daughters, Irma Morace and Barbara Rice, sued the LPCF and Dr. Douglas M. Liles for Mrs. Miller's damages sustained when Dr. Liles performed *752 the wrong surgery on her hands. The judgment is amended and affirmed, as amended.

FACTUAL AND PROCEDURAL BACKGROUND
Since 1998, Dr. Liles treated Mrs. Miller for degenerative back problems. During 2000 her fingers began triggering (locking down against her palms). Mrs. Miller saw Dr. Liles, who, on November 20, 2000, performed as outpatient surgery a flexor tendon release on the palms of both hands. On November 22, Mrs. Liles returned to Dr. Liles, who found the triggering was not solved. He determined that her problem was caused by the extensor tendon on the back of the hand, rather than the flexor tendon on the inside. The doctor stated he advised Mrs. Miller she would need additional surgery on the back of her hands to resolve the problem. On December 1, she returned to Dr. Liles with her daughter Barbara Rice. Dr. Liles stated he told the ladies Mrs. Miller needed additional surgery; Mrs. Rice stated the doctor advised them of his error but did not inform them of the need for additional surgery.
On August 20, 2001, Mrs. Miller saw a doctor in Metairie, Dr. Stokes, who ordered a brace for her. By then, she had flexion contractures (scarring) causing her fingers to contract inward.
Two months later, Mrs. Miller saw Dr. Robichaux, who diagnosed rheumatoid arthritis and extensor tendon dysfunction complicated by severe flexion contractures, which in his opinion were caused by Dr. Liles's surgery. Dr. Robichaux performed surgery on her left hand on January 15, 2002, to repair the extensor tendons and to replace joints in her knuckles of her ring and little fingers. On February 25, 2002, Mrs. Miller saw Dr. Robichaux, who found she had an excellent recovery from her surgery. He planned to surgically address the right hand after Mrs. Miller fully recovered, a period the doctor opined to be nine to twelve months. However, she died before that surgery could be done.
Following a bench trial, Judge Alvin Sharp awarded the following amounts:

 Physical Pain and Suffering $ 75,000.00
 Mental Pain and Suffering $ 75,000.00
 Past Medical Expenses $ 26,132.22
 Permanent Disfigurement $ 75,000.00
 Disability $115,000.00
 Loss of Enjoyment of Life $115,000.00
 __________
 Total $481,132.22
 ===========
 plus interest from the
 date of judicial demand
 plus costs

Plaintiffs have since settled with Dr. Liles and the Louisiana Patient's Compensation Fund (LPCF) has appealed complaining that quantum is excessive and asserting the total award should not exceed $75,000.00.

TESTIMONY
Irma Morace testified:
 The mother of four, Mrs. Miller lost her son in 1982 and lost a daughter, Beverly, during January 2002 when she was suffering from her hand problems.
 Her mother loved to make handcrafts and Christmas decorations for the yard; the decedent also enjoyed painting, gardening, cooking, and playing the piano, harmonica, and accordion. She made flower beds and planted flowers when she moved to West Monroe. Mrs. Miller won contests several times for Christmas decorations with which she decorated extensively inside and out.
 The family was very close, and Mrs. Miller traveled to visit relatives including the decedent's siblings in Winnsboro and daughter in south Louisiana.
 Mrs. Miller took care of herself, was very private and did not like to ask others for assistance; she frequently *753 had lunch prepared for Mrs. Morace when she came home for lunch to her mobile home, which was right beside her mother's.
 As a result of an auto accident years earlier, Mrs. Miller had intermittent back problems for which she consulted doctors, received shots, took pain medication, and went to a pain management center.
 Problems with her hands locking began in 2000.
 Anxious before the initial surgery, Mrs. Miller was pale, drawn, crying and in pain after the surgery. Mrs. Miller was taken home that morning, helped into comfortable clothes and given lunch. The evening of surgery, Mrs. Miller was still in pain. While better the next day, she still cried with pain and had to be helped to use the bathroom.
 After her return visit to Dr. Liles, she reported the doctor had told her he made a mistake and cut the wrong sides of her hands. Mrs. Miller was upset and bewildered about the surgery error.
 In the weeks following surgery, both hands drew up and became claw-like with the fingers "melted down into her palms."
 That Christmas was very difficult because she could not decorate, cook, or take care of her hair, all of which she had done prior to hand surgery. Prior to Christmas 2000, Mrs. Miller had Christmas for family and friends in her home but that year could not do so, which depressed her. During Christmas 2001, her family decorated her home for her while Mrs. Miller continued going back and forth to Baton Rouge for therapy, and she was very depressed.
 In 2001, her hands were useless; she could not button clothes, tie shoes, roll her hair or apply makeup, which robbed her of independence.
 Following Dr. Robichaux's surgery in Baton Rouge, Mrs. Miller returned to West Monroe in February 2002 and was pleased with her left hand repair.
 She became ill with pneumonia and was hospitalized, at which time she learned she had suffered a heart attack and subsequently had heart surgery.
 Her mother never returned to being the kind of fun, happy person she was prior to Dr. Liles's surgery.
 Seventy-eight years old at the time of her death, Mrs. Miller's prior health problems included surgical removal of 2/3 of her stomach due to ulcers, emphysema, high blood pressure, coronary artery disease in addition to her back problems. She also had osteoporosis and anxiety problems and took Darvocet for pain. Other prior surgeries included a hysterectomy along with cataract and gall bladder operations.
Lisa Morace, a granddaughter, testified:
 Her grandmother, whom she saw almost daily, taught her a great deal about gardening, which they had in common.
 Mrs. Miller was active and fun prior to the November 2000 surgery, after which she was in pain and required assistance for even going to the bathroom and other basic tasks.
 Mrs. Miller was depressed, scared, and could not take care of her dog, which was put to sleep. She could no longer drive after the initial hand surgery.
 After surgery she had to wear a brace, and her left hand never returned to *754 the way it was prior to her hand problems.
Charlotte Johnson, a granddaughter, testified:
 Mrs. Miller was fun to be around, always tried to feed the family and taught her to paint.
 Prior to the November 2000 surgery, Mrs. Miller's fingers closed and she could straighten them with her other hand or against furniture. However, she was the "same old card, cutting up and cracking jokes."
 Mrs. Miller was scared but hopeful before the surgery. The day of surgery and the next, Mrs. Miller cried with pain.
 She drove her grandmother to the appointment with Dr. Liles a couple of days after surgery. Mrs. Miller was upset and depressed following the visit because the doctor had made a mistake and her hands were not fixed.
 That result caused a great depression after which she was never the same. Instead of going everywhere and doing things, Mrs. Miller wanted to stay home and do nothing.
 After Dr. Robichaux's surgery, she could not open and shut her hand in a normal fashion.
Barbara Rice, another daughter, testified:
 Her mother was a loving, involved, supportive parent. In addition to her activities described by other witnesses, Mrs. Miller loved NASCAR and was a devoted Dale Earnhart fan.
 She accompanied her mother to Dr. Liles on December 1 and observed the entire visit. She heard Dr. Liles explain that he had "goofed" and denies that he told Mrs. Miller she needed additional surgery after the first of the year. Had she known her mother needed more surgery, she would have found a doctor for the procedure.
 After her own diagnosis of breast cancer in January 2001, Mrs. Miller came down to be with her in Baton Rouge and was there for every chemo and radiation treatment, which lasted from April until Thanksgiving 2001. Although she could not physically render help, she offered emotional support. Other family members took Mrs. Miller back and forth to Baton Rouge.
 Mrs. Miller saw Dr. Robichaux in November 2001 and, on his instruction, went to 26 very painful therapy sessions to prepare her hands for surgery with Dr. Robichaux.
 Mrs. Miller's hands had scars from Dr. Liles's surgery.
 After Dr. Robichaux's surgery, she could open and close her hand, but not fully.
 At the end of January 2002, Mrs. Miller was not in pain from her left hand.
Dr. Liles testified that Mrs. Miller's finger problems are very common for people in her age group and most are caused by flexor tendons which allow the fingers to bend toward the palm. Dr. Liles admitted incorrectly diagnosing Mrs. Miller's problem and performing surgery on her palm side instead of the back of her hand. Dr. Liles stated the surgery only took minutes and the wounds were dressed with Band-Aids and gauze. She went home that day with pain medication for which she never requested a refill. She again saw Dr. Liles twice, two and then days following the surgery and never returned thereafter.

DISCUSSION
On appeal, the LPCF does not make an issue of the sum awarded for medical expenses but asserts that the award for general *755 damages is excessive and should be reduced to no more than $75,000.00. In Cole v. Pool, 34,329 (La.App. 2d Cir.12/6/00), 774 So.2d 1081, 1083, this court noted that:
General damages involve mental or physical pain and suffering, inconvenience, loss of intellectual or physical enjoyment or other losses of lifestyle which cannot be measured exactly in monetary terms. In the determination of general damages, the discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. La. C.C. art. 2324.1. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award. The primary considerations in the assessment of damages are the severity and duration of the injured party's pain and suffering.
Only after an abuse of discretion is disclosed by an articulated analysis of the facts is an examination of prior awards in similar cases proper; an abusively low award is raised to the lowest amount the trier of fact could have reasonably awarded, while an abusively high award is reduced to the highest amount the trier of fact could have reasonably awarded. The proper procedure for examining whether an award is excessive is to determine whether the amount can be supported under the interpretation of the evidence, most favorable to the plaintiff, which reasonably could have been made by the trier of fact. (Citations omitted.) See also discussion in Taylor v. Armstrong, 36,514 (La.App.2d Cir.10/23/2002), 830 So.2d 454.
Examining the evidence in the light most favorable to Mrs. Miller's family, we find that the $455,000.00 ($481,132.22 less $26,132.22 for past medical expenses) general damages award is not supported by this record and is unreasonably excessive under the facts of this case.
Concerning Mrs. Miller's treatment, Dr. Liles admitted he performed the wrong surgery and acknowledged that the worsened condition of her hands resulted from that incorrect procedure. The mistaken, relatively minor surgery performed by Dr. Liles on both hands resulted in a great deal of pain and discomfort to a previously very active person who was rendered unable to provide basic care for herself while her hands healed. Soon thereafter, due to the error by Dr. Liles, Mrs. Miller's hands began locking down with contractures, the left hand being more severely impaired. Dr. Liles also acknowledged that Mrs. Miller had inactive rheumatoid arthritis prior to his surgery and admitted that surgical trauma could have activated the disease, as could have the emotional trauma of her family problems.
The trial court specifically found that although Dr. Liles admitted his error to Mrs. Miller, he did not sufficiently inform her of the need for additional surgery to address and correct the condition of her hands. Contrary to Dr. Liles's testimony that he informed Mrs. Miller on December 1 that she needed additional surgery after the first of the year to fix his mistake, Barbara Rice attended that visit and specifically denies her mother was so informed.
Her family all testified Mrs. Miller was upset, bewildered and depressed that Dr. Liles's operation had not repaired her hands. Over time Mrs. Miller's hand became worse due to scarring resulting from Dr. Liles's surgery and complications from rheumatoid arthritis. Her hands became *756 claw-like, which severely limited her ability to function.
An expert in orthopedic hand surgery, Dr. Robichaux stated a contracture is scarring that limits movement. Mrs. Miller had significant scarring after Dr. Liles's surgery. Dr. Robichaux stated that Mrs. Miller developed contractures as a result of the surgery performed by Dr. Liles. The contractures were so severe that she could not straighten her fingers manually as she had been able to do prior to Dr. Liles's surgery. Had she not been subjected to that erroneous procedure, she would not have developed the scarring and immobility of her left hand.
After she saw Dr. Robichaux in Baton Rouge and in order for her to undergo the corrective surgery on her left hand, she had to endure 26 very painful physical therapy sessions in order to loosen the contractures (scarring) immobilizing her fingers. Dr. Robichaux placed her in dynamic splints which pulled her fingers straight with pulleys and rubber bands.
During the course of Dr. Robichaux's treatment, he referred her to a rheumatologist, who confirmed Dr. Robichaux's diagnosis of rheumatoid arthritis in her hands which caused her fingers to have ulnar drift (bend toward the little finger) which required a nighttime splint.
Dr. Robichaux opined that had Mrs. Miller received the correct surgery from Dr. Liles, she would have avoided the problem of her fingers triggering or closing into her palms. The severe contractures on her left hand resulted in Mrs. Miller having to undergo much more extensive surgery by Dr. Robichaux, who replaced the knuckle joints in her little and ring fingers of her left hand. The doctor characterized his surgical procedure as a "huge operation." Even after she returned to West Monroe from Baton Rouge, Mrs. Miller had to spend 15 minutes four or five times a day exercising her hand and she also saw a physical therapist.
Dr. Robichaux pointed out that her rheumatoid arthritis was not caused by Dr. Liles's error. Moreover, the contractures were not, in themselves, painful. When he last saw Mrs. Miller in February after her January 2002 surgery, she had healed well, was making a remarkable recovery and regaining the ability to fully extend and close the fingers of her left hand. Dr. Robichaux acknowledged that Mrs. Miller endured quite an ordeal due to the incorrect surgical procedure.
It is undisputed that Mrs. Miller began her hand surgery debacle with myriad serious health problems. She had chronic back pain for which she required medication (Darvocet), stomach surgery for ulcers, emphysema, high blood pressure, coronary artery disease, osteoporosis and anxiety problems. Other prior surgeries included a hysterectomy along with cataract and gall bladder operations. The testimony of her daughters and granddaughters showed that, in spite of those daunting problems, Mrs. Miller led an active and uncomplaining life prior to Dr. Liles's surgery in November 2000. The results of Dr. Liles's error caused her severe depression and limited her ability to undertake activities. According to her family, she never recovered from that decline which was complicated by family troubles and her health.
Both the plaintiffs and the LPCF refer to Wakefield v. Reliance National Indemnity Co., 02-1173 (La.App. 5th Cir.4/29/03), 845 So.2d 1238, to support their respective arguments that the general damages award should be affirmed or reduced. Similar to Mrs. Miller, Mrs. Wakefield was affected "by a plethora of pre-existing medical conditions" which required pain medication. At age 75, Mrs. Wakefield *757 was in an auto accident in which she suffered a serious compound wrist fracture which required four surgeries and six weeks in an external fixator followed by a cast. Her wrist was permanently misshapen. Due to having very soft bones, Mrs. Wakefield had a non-union of the bone, some residual pain, and loss of function. She had difficulty performing basic tasks such as buttoning clothing and cleaning her home. Her occupational therapist testified she had met therapy goals and could perform tasks of daily living. The court found the general damage award of $150,000.00 was neither abusively low nor high and declined to increase the award to $300,000.00 to $400,000.00.
The LPCF correctly observed in its reply brief that cases relied upon by the Miller family as support for the trial court's excessive award of general damages were distinguished by the Wakefield court because those plaintiffs suffered serious injuries to other body parts or more serious conditions. See Delaune v. Medical Center of Baton Rouge, 95-1190 (La.App. 1st Cir.10/25/96), 683 So.2d 859, writs denied, 97-0218, 98-0243 (La.3/21/97), 691 So.2d 84; Matthews v. Ferrer, 95-0266 (La.App. 4th Cir.11/30/95), 665 So.2d 1211; Detraz v. Hartford Accident & Indemnity Co., 94-708 (La.App. 3d Cir.12/17/94), 647 So.2d 576.
In essence, the LPCF appears to argue that because of Mrs. Miller's wide assortment of serious health problems, the damage caused by Dr. Liles's actions are somehow less significant. This court views Mrs. Miller's circumstances the opposite way. Because this fun-loving, active lady had so many other ailments, the result of the incorrect surgery was even more devastating.
Mrs. Miller had scarring on the palms of her hands from Dr. Liles's erroneous surgical procedures. Although both she and Dr. Robichaux were pleased with the recovery of her left hand following the 2002 surgery, her family stated she never entirely regained the function in her left hand.
Interpreting the evidence most favorably to Mrs. Miller, we conclude that the general damages award was abusively excessive. Therefore, we amend the judgment by reducing the general damages award to $150,000.00, the most generous award reasonable under the facts. See Wakefield, supra. In addition, the LPCF must pay $26,132.22 for past medical expenses, plus costs and legal interest from the date of judicial demand. The costs of this appeal are $143.50 and trial court costs are $1,895.04.

DECREE
The judgment against the Louisiana Patient's Compensation Fund is amended to reduce the general damages award to $150,000.00 to be paid along with $26,132.22 for past medical expenses, plus trial and appellate court costs of $2,038.54 and legal interest from the date of judicial demand.
AMENDED, AND AS AMENDED, AFFIRMED.